NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 230866-U

NO. 4-23-0866

IN THE APPELLATE COURT

FILED
January 27, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| DAVID D. SMITH, | ) | No. 19CF247 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court
Presiding Justice Harris and Justice Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for murder was affirmed where (1) the trial court's erroneous admission of other-crimes evidence was harmless error and (2) the court's comment during *voir dire* did not thwart the selection of a jury free from bias or prejudice.

¶ 2    Defendant David D. Smith appeals from his conviction and natural-life sentence for the murder of Donna Bricker, an 80-year-old woman who used to be his next-door neighbor. Bricker's body was discovered in her home, in January 2019, stabbed in the heart with a pair of scissors containing defendant's DNA. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    In this case, the State charged defendant with three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(2) (West 2018)), alleging in one count that defendant had "the intent to kill

or do great bodily harm to Donna Bricker." The State further alleged that two aggravating factors were present: (1) Bricker was 60 years of age or older at the time she was murdered and (2) the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. 730 ILCS 5/5-5-3.2(b)(2), (b)(3)(ii) (West 2018).

¶ 5         Because our focus in this appeal is primarily on the trial court's order *in limine*, we first address the information before the court at that time; we will then briefly address the evidence at trial.

¶ 6                    A. The Order *in Limine*

¶ 7                    1. *The State's Motion*

¶ 8         Pursuant to Illinois Rule of Evidence 404(c) (eff. Jan. 1, 2011), the State filed a motion *in limine* asking the trial court "to allow the State to present evidence of a prior bad act to establish the Defendant's identity and motive in the State's case-in-chief."

¶ 9         In the motion, the State alleged the following facts that it believed it would prove at trial:

> "On January 6, 2019, the Springfield Police Department responded to the home of Donna Bricker, age 80. Bricker lived alone in a duplex home *** in Springfield, IL. Officers located Bricker [lying] on her bed, deceased. Bricker was wearing pajamas, and her hands were bound behind her back with a piece of cloth. An electrical cord was wrapped tightly around her neck, and her mouth was stuffed with a cloth gag. Bricker had been stabbed in the chest with a pair of medical scissors, which remained lodged in her chest. Bricker's purse and its contents were laid out next to her on the bed. Rigor mortis was fully present, suggesting Bricker had been dead for several hours. After autopsy, the pathologist noted evidence of

ligature strangulation, a stab wound to the chest, and blunt force trauma to the head. The pathologist concluded that Bricker died as a result of a ligature strangulation with the stab wound and blunt force injuries to the head as significant contributing factors.

In a search of the neighborhood around the home, detectives located a wash cloth. Subsequent laboratory analysis detected the presence of human DNA consistent with the Defendant's profile on the scissors and wash cloth.

The Defendant was interviewed by detectives on March 14, 2019. The Defendant acknowledged that at the time of the offense, he lived *** in the duplex next to Bricker. The Defendant also acknowledged that he knew Bricker, but he had not been in the home at any recent point before the homicide.

The evidence would further show that at the time of the offense, the Defendant was serving a period of mandatory supervised release from the Illinois Department of Corrections. The Defendant had previously been sentenced for a home invasion in [Vermilion] County Circuit Court case number 1994-CF-24. The 1994 home invasion proceeded to a jury trial *in absentia* on May 26, 1994. The facts adduced at trial established the following:

Carolyn Bireline, age 76, testified at trial that she ran a dog grooming business out of her home. Bireline had previously employed the Defendant during the summers of 1988 and 1991. At about 3:00 AM, January 14, 1994, Bireline awoke to two men inside of her home. The two men placed a pillowslip over her head and demanded 'money and jewels.' After the two men obtained about $650 in Bireline's bedroom, they attempted to bind Bireline's hands with an extension cord.

- 3 -

One of the suspects then struck Bireline in the head multiple times in the head with a candleholder, causing two lacerations to her head. The suspects then fled Bireline's home.

Law enforcement located the Defendant and Albert Lomax about a half hour later. The Defendant was in possession of $655. He was wearing a jacket with apparent blood on it, as well as a glove covered in gold glitter from the candleholder used [as] a bludgeon.

Later on the morning of January 14, the Defendant gave a statement to Detective Bruce Stark of the Danville Police Department. The Defendant admitted that he and Lomax went to Bireline's home to commit a robbery. Bireline was targeted because the Defendant knew the layout of Bireline's home. Lomax also confessed involvement in the offense. The Defendant was convicted of home invasion at trial. Lomax was also convicted after a trial on April 27, 1994.

The Defendant was sentenced to 40 years for the 1994 home invasion. The People believe Bireline died in 2005 and is no longer available to testify. The Defendant was released from prison on January 3, 2019, three days before Bricker was found dead."

¶ 10                                    2. *The Hearing*

¶ 11        The trial court held a hearing on the State's motion on April 28, 2023. The State mentioned that while defendant had been released from prison three days before Bricker's death, he had spent some time on parole.

¶ 12        The State explained the purpose behind the motion as follows:

"In terms of using other crimes evidence, what we want to use it for here, as we outlined in our motion, is two specific purposes. One, to show the identity of the subject, the suspect. Although we're going to have DNA evidence here that's circumstantial, and this previous case is powerful corroboration that that DNA is not innocently on those pair of scissors. And we also want to use it as evidence of motive, that the reason this crime was committed was with the intent to commit a robbery.

Now, I will note we have not alleged felony murder in this case; but we do think establishing a motive helps provide the jury with some context and gives them the theory of the State's case.

When it comes to identity or motive and other crimes evidence, all we need to show as the case law establishes is that the two cases share [mere] general areas of similarity. We suggest that given the details that are uncommon in both cases, we far exceed mere general areas of similarity.

I will note for some context if the State wanted to use this as *modus operandi*, it's a higher burden, right. We have to show a high degree of factual similarity. And although I think an argument could be made for that, we're not seeking that here. But we do think we satisfy that there are [mere] general similarities between these two crimes, and it's worth presenting to the jury as identity and motive evidence."

¶ 13    Defense counsel began his response to the State's argument as follows:

"I'm not going to try to lose credibility here by arguing that these two offenses are not factually similar. They are. That's the bottom line.

So, the focus of our argument is the remoteness in time. It's a 1994 case, 25 years prior. We believe that, given that fact, that the prejudicial effect outweighs the probative value."

¶ 14        After defense counsel's argument, the trial court granted the State's motion, explaining its reasoning as follows:

"Yeah, the Court was initially a little bit concerned about the length of time between the convicted conduct and the conduct on trial here before the Court today. However, when coupled with the fact that the Defendant was within days released on parole from that very offense makes the probative value of the evidence I think enhanced to a degree that the prejudicial impact of such testimony and evidence, while it's great, isn't—doesn't substantially outweigh the probative value of that conviction, the conduct related to the conviction.

In a case where otherwise innocen[t] explanations could be had for circumstantial evidence, such as DNA, I agree with the State, probative value of such evidence is increased again. And I am going to allow that evidence to be admitted into trial in the State's case in chief for those reasons. The nature of time can certainly be argued, but it doesn't prevent the evidence from being admitted in this Court's opinion. And the probative value is not outweighed by unfair prejudice. I'm going to allow it."

¶ 15        The trial court reserved judgment as to whether defendant's release from prison on January 3, 2019, could be divulged to the jury; ultimately, this fact did not come out at trial.

¶ 16                        B. Defendant's Motion to Suppress

¶ 17    Defendant filed a motion to suppress evidence that the State had obtained from his cell phone showing that he had searched online for articles on unsolved murders in Springfield and Sangamon County. The trial court held a hearing on the motion to suppress on May 2, 2023, just four days after the hearing on the State's motion *in limine*. The State argued that the evidence from defendant's cell phone was obtained pursuant to a valid search warrant supported by an affidavit from Detective Russell Lehr of the Springfield Police Department.

¶ 18    The State introduced Lehr's affidavit, which was dated March 18, 2019, and included the following statement:

> "There were personal items (social security card, wallet, purse, bank bag with documents, etc.) that had been laid on the bed neatly next to [Bricker's] body, indicating that *someone may have tried to stage a robbery*. There did not appear to be any items taken. Some of the documents on the bed were in envelopes which consisted of things like car titles, bank statements, etc." (Emphasis added.)

¶ 19    The trial court denied defendant's motion and allowed the State to introduce the evidence at trial.

¶ 20                                    C. The Trial

¶ 21    The case proceeded to a jury trial on June 26, 2023.

¶ 22                                    1. *Voir Dire*

¶ 23    The trial court conducted *voir dire* in panels of 15 potential jurors. When asking questions to the first panel, the court asked:

> "What about the very nature of this case[?] It does involve an allegation of First Degree Murder. You have been told that the victim alleged to have deceased is of an elderly age, age 80. Is there anything about this particular fact pattern that

causes concerns for the Court about your ability to sit and be fair and impartial? Anyone in the front row have any concerns? How about the back row, anyone in the back row? All right.

Along those same lines, are you able to avoid—we all have sympathies, we all probably have biases and potentially some prejudices even if they're implicit. Can you all promise to avoid using your sympathies, biases, prejudices in influencing your verdict? Anyone have a problem with that concept in the front row? *You're overly sympathetic, you're overly harsh, you're a sociopath. Anyone in the front row want to identify yourself as a sociopath? How about the back row, anyone in the back row?* All right, very good." (Emphasis added.)

¶ 24 Neither defendant nor the State objected to this question, nor did they refer to it when asking follow-up questions or mention it when the trial court and the parties were addressing strikes or disqualification of jurors. Ultimately, ten of the potential jurors who were asked this question were stricken, either for cause or by one of the parties; five were seated as jurors.

¶ 25 2. *The Forensic Evidence*

¶ 26 In its case-in-chief, the State introduced significant DNA evidence. According to the State's DNA expert, the likelihood that the DNA on the scissors and washcloth belonged to defendant was astronomical; there was only a 1 in 620 septillion chance that the DNA belonged to someone else. The State's expert testified that the analysis of the scissors was straightforward because there was a great deal of defendant's DNA on them.

¶ 27 The DNA evidence connecting defendant to other objects in Bricker's home was weaker, ranging from a 1 in 3 chance to a 1 in 12 chance that the DNA belonged to someone else. Furthermore, the DNA on some objects was found not to belong to defendant, and defendant's

fingerprints were not present on the scene. Although disposable gloves were found near Bricker's home, defendant's DNA was not found on them. On cross-examination, the State's DNA expert confirmed that DNA can remain on an object for multiple years and that a person's DNA can be transferred from his hands to an object and from that object to another.

¶ 28 The State called Detective Michael Mazrim of the Springfield Police Department to testify about his investigation of the crime scene. On cross-examination by defendant, Mazrim testified that the murder appeared to be a staged robbery, which he had also noted in the police report documenting his initial thoughts.

¶ 29 3. *Defendant's Police Interview*

¶ 30 The State introduced a video of defendant being interviewed by Lehr and Mazrim on March 14, 2019. Contrary to the State's representation in its motion *in limine*, defendant did not acknowledge in the interview that he lived next to Bricker at the time of the offense; instead, he said that his former apartment next to Bricker was vacant but that he had lived there several months earlier.

¶ 31 According to defendant, he returned to the area to visit his former neighbor Damon on the morning of either January 4 or 5, 2019. Defendant told the police:

> "When I walked up to the door, knocked on their door, nobody answered and I come back off the porch and that's when Dorothy [*sic*] pulled up and I waved at her. She waved at me and then we got to talking. She said that Damon wasn't there anymore. She hadn't seen him and his girlfriend for a while and she got out and she would had a little laundry basket that a bunch of s*** that fell over in the back seat of her car. So, she was in one side getting stuff out and I went around the other side [threw] some s*** in the basket for her. I had a head cold that morning.

She gave me some little Altoid thing with some Sudafed in it, Sudafed pills for my head cold."

Defendant described the items in the laundry basket as follows: "It had some, a few clothing items in it. I think it was some sweaters in there, like some shirts, uh, coffee cups, some tumblers and what look like to be candy dishes, uh, jewelry dishes and s*** like that." Defendant did not mention scissors or a washcloth.

¶ 32       Defendant also said that approximately a year and a half earlier, he had helped her "move stuff out of her car" and into her apartment, including "little car[d] table chairs and a little card table and some pots and pans and s*** like that." He acknowledged that he had robbed Bireline in 1994 for a few hundred dollars, but he asserted that he was in another part of the house when Lomax tied up Bireline and hit her with a candlestick.

¶ 33       The detectives eventually told defendant that they had found his DNA on the murder weapon, without stating what the murder weapon was. Defendant did not ask what the murder weapon was, but he vehemently denied killing Bricker. After further questioning, defendant ended the interview, telling the detectives, "If you're saying that my DNA is on that murder weapon, then this conversation is over with."

¶ 34                              4. *The 1994 Robbery*

¶ 35       When the State sought to introduce evidence of the 1994 robbery, defendant again objected. The trial court adhered to its prior ruling as follows:

"[T]he similarities of the events are what makes it so probative. And I am of the opinion that they should be able to elicit the similarities in both events to establish that probative nature. I don't believe they've exceeded the scope of what the Court has ruled previously. ***

- 10 -

> So, to compromise, this Detective who investigated this case should be able to give all the details that tie Mr. Smith to that crime, that tie that crime to this crime."

¶ 36 The State introduced evidence of the 1994 robbery by way of the detective's testimony, which tracked the allegations in the State's motion *in limine*. *Supra* ¶ 9. At the conclusion of the detective's testimony, the trial court instructed the jury that the testimony had been "received on the issue of the Defendant's identification, intent, knowledge [*sic*] and may be considered by you only for that limited purpose." Pursuant to the court's pretrial ruling, no evidence was offered concerning the fact that defendant had been released from prison for the 1994 robbery three days before Bricker's death.

¶ 37                                  5. *The Jury Instruction Conference*

¶ 38 At the jury instruction conference, the State tendered an instruction that would inform the jury that it could consider the evidence regarding the 1994 robbery as proof of intent and identity. Defendant objected, arguing that the instruction should address motive and identity as the State had initially proposed; however, defendant did not explicitly address whether the instruction could address *lack of* motive. The trial court overruled defendant's objection, concluding that intent and identity were the appropriate purposes.

¶ 39 The State then pointed out that the jury instruction the State had tendered still contained a reference to motive and that the State would correct it to refer to intent instead of motive. In response, the trial court further explained its reasoning as follows:

> "All right. And, with that, *I don't think motive was ever really proven or alleged in this case.* I guess it could be suggested that his motive for appearing on her property, presenting himself there, was absolute malice based on that prior bad act. But

[Mazrim's] testimony regarding the lack of robbery or any motive gives the Court concern about placing that purpose into this equation." (Emphasis added.)

¶ 40     The State tendered the corrected instruction, which the court provided to the jury.

¶ 41                    6. *Closing Arguments*

¶ 42     When addressing the 1994 robbery in its initial closing argument, the State told the jury, "You may consider the similarities in these events to conclude that it was no accident that the Defendant's DNA was on those scissors."

¶ 43     In defendant's closing argument, he argued that his DNA must have been transferred to the scissors from something he had touched when carrying things into Bricker's home or from one of the objects he had touched in the laundry basket. He also focused significantly on the State's failure to prove any motive for the murder of Bireline. Defendant argued that the jury could consider the 1994 robbery as evidence of his lack of motive, pointing out that the defendant's participation in the 1994 robbery was motivated by his desire to steal Bireline's money.

¶ 44     In its rebuttal closing argument, the State stated as follows to the jury:

"[Y]ou are allowed to consider the similarities in that incident versus this incident for the purpose of your consideration of whether it was the Defendant that committed this offense, the issue of identity and also as to intent. *That's why the 1994 incident is critical to this case.*" (Emphasis added.)

¶ 45                    7. *The Verdict and Sentence*

¶ 46     The jury convicted defendant of first degree murder and found that the two aggravating factors were present as alleged by the State. The trial court sentenced defendant to natural life imprisonment.

¶ 47　　　　This appeal followed.

¶ 48　　　　　　　　　　II. ANALYSIS

¶ 49　　　　　　　　A. Other-Crimes Evidence

¶ 50　　　　Defendant argues that the trial court erred by granting the State's motion *in limine* to admit evidence of the 1994 robbery. "A motion *in limine* is addressed to the trial court's inherent power to admit or exclude evidence. A court of review will not reverse a trial court's grant or denial of a motion *in limine* absent a clear abuse of discretion." *People v. Williams*, 188 Ill. 2d 365, 369 (1999). However, "a trial court abuses its discretion if it fails to apply the proper criteria when it weighs the facts, and our inquiry must consider both the legal adequacy of the way the trial court reached its result as well as whether the result is within the bounds of reason." *People v. Ortega*, 209 Ill. 2d 354, 360 (2004). Determining the proper criteria for admissibility under the Illinois Rules of Evidence is a question of law that we review *de novo*. See *People v. Trutenko*, 2024 IL App (1st) 232333, ¶ 126.

¶ 51　　　　　　　　1. *Legal Standard*

¶ 52　　　　A great deal of confusion could have been avoided in this case had there been a more careful discussion of how the State's proffered evidence would actually be used at trial. We therefore take this opportunity to step back and explain some first principles.

¶ 53　　　　Apart from three statutory exceptions not applicable here, Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). This evidence, referred to as other-crimes evidence or other-act evidence, "is not considered irrelevant; instead, it is objectionable because such evidence has 'too much' probative value." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (quoting *People v. Manning*, 182 Ill. 2d 193, 213 (1998)).

Although Rule 404(b) is not limited to criminal proceedings (see Ill. R. Evid. 1101 (eff. Jan. 6, 2015)), it applies with particular force when the State offers other-crimes evidence against a criminal defendant because "[the d]efendant is entitled to have his guilt or innocence evaluated solely on the basis of the charged crime." *Donoho*, 204 Ill. 2d at 170. This heightened concern is why the State is generally required to notify the defendant before trial when it intends to rely on other-crimes evidence. Ill. R. Evid. 404(c) (eff. Jan. 1, 2011).

¶ 54        Although evidence of other crimes is not admissible to prove propensity, it may be admissible for one or more non-propensity purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). In other words, Rule 404(b) is not a categorical bar to the admission of other-crimes evidence; its concern is the purposes for which such evidence may be used and the *inferences* that can be drawn from it. In particular, it is intended to guard against the possibility the jury will use that evidence to draw the forbidden propensity inference: defendant committed an earlier crime, therefore he must have committed this one. "[W]here the other-crimes evidence 'has no value beyond that inference, it is excluded.' " *People v. Ross*, 2018 IL App (2d) 161079, ¶ 165 (quoting *Manning*, 182 Ill. 2d at 214); see *Donoho*, 204 Ill. 2d at 170 ("Courts generally prohibit the admission of [propensity] evidence to protect against the jury convicting a defendant because he or she is a bad person deserving punishment."). The key characteristic of a valid non-propensity purpose is that it allows the jury to reach a factual conclusion through "some propensity-free chain of reasoning." *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (*en banc*) (applying Fed. R. Evid. 404(b) (eff. Dec. 1, 2011)); see *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 108 ("The Illinois Rules of Evidence largely track the Federal Rules of Evidence. [Citation.] Thus, it is appropriate to look to federal cases for guidance.").

¶ 55          Other-crimes evidence is also subject to other evidentiary rules. First and foremost, other-crimes evidence must be relevant, meaning that the non-propensity fact sought to be proved (or disproved) must be a "fact that is of consequence to the determination of the action," and the evidence must make that fact "more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011); see *Donoho*, 204 Ill. 2d at 170 ("Other-crimes evidence is admissible *** to prove *** any material fact other than propensity that is relevant to the case ***."). If other-crimes evidence is irrelevant, it is inadmissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Even when other-crimes evidence is relevant, however, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 56          Of course, the probative value of the other-crimes evidence must be measured by reference to what the evidence is probative of—the non-propensity fact it was offered to prove— and must be weighed against "a high risk of prejudice." See *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980). The nature of the evidence will be a pertinent consideration as well; for instance, the probative value and prejudicial weight will likely differ for a certified copy of a conviction and a photograph of a violent crime scene. See *People v. Garcia*, 2017 IL App (1st) 133398, ¶ 73 (explaining that courts should "carefully limit[ ] the details of the other crime to what is necessary to illuminate the issue for which the other crime was introduced"). Finally, even when the evidence is admitted for a valid non-propensity purpose, it remains inadmissible to show propensity (Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)), so "the court, upon request, shall restrict the evidence to its proper purpose *** and instruct the jury accordingly" (Ill. R. Evid. 105 (eff. Jan. 1, 2011)).

¶ 57    As such, a proper exercise of discretion under these rules requires the trial court to consider the non-propensity purpose (or purposes) for which a given piece of other-crimes evidence is being offered, which means it is critical for the proponent of the evidence to identify that purpose. Absent some indication in the record that the trial court considered additional non-propensity purposes *sua sponte*, we review its exercise of discretion based on the purposes the proponent identified. See *Ortega*, 209 Ill. 2d at 360 ("[W]hile formal findings of fact and statements of reasons are not required, the trial court must make a record adequate to allow meaningful review of its exercise of discretion."). For instance, this court has found error when the trial court "admit[ed] evidence of another crime *** on the issues of knowledge and lack of mistake" but "instructed the jury that the evidence of other crimes could be considered on the issues of identification and design." *People v. King*, 165 Ill. App. 3d 464, 468 (1988).

¶ 58    When addressing the nearly identical federal rule (Fed. R. Evid. 404(b) (eff. Dec. 1, 2011)), the Seventh Circuit "cautioned that it's not enough for the proponent of the other-act evidence simply to point to a purpose in the 'permitted' list and assert that the other-act evidence is relevant to it." *Gomez*, 763 F.3d at 856. Instead, trial courts "should not just ask *whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." (Emphases in original.) *Id.* We believe this same degree of caution is advisable when trial courts apply Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011).

¶ 59                    2. *The State's Theories of Admissibility*

¶ 60    In its motion *in limine* and again at the hearing on the motion, the State identified the following two non-propensity purposes:

"In terms of using other crimes evidence, what we want to use it for here, as we outlined in our motion, is two specific purposes. One, to show the identity of the subject, the suspect. Although we're going to have DNA evidence here that's circumstantial, and this previous case is powerful corroboration that that DNA is not innocently on those pair of scissors. And we also want to use it as evidence of motive, that the reason this crime was committed was with the intent to commit a robbery."

We address these purposes in reverse order.

¶ 61                                  a. Motive/Intent

¶ 62        With respect to motive, it seems that the State did little more than "point to a purpose in the 'permitted' list and assert that the other-act evidence [wa]s relevant to it." *Id.* Although motive and intent both involve the defendant's mental state, they are analytically distinct; intent addresses *what* the defendant wanted to do, while motive addresses *why* he wanted to do it. The State made no effort to address why the person who committed this crime wanted to commit a robbery, as the trial court later recognized when it instructed the jury on intent rather than motive.

¶ 63        Evidence of the 1994 robbery is simply not justified on the basis of showing defendant's intention or motive. If defendant admitted committing the act giving rise to the crime but denied the requisite intent, the fact that he previously committed an earlier, similar crime might help show his true intent. Here, however, the dispute is not what defendant *intended* when he stabbed Bricker, but whether he did so at all. The earlier robbery offers no assistance in answering that question. Similarly, if defendant admitted entering Bricker's residence but denied the intention to rob her or do her harm, the prior incident of entering an elderly woman's home to beat and rob

her might be highly relevant evidence of motive. Here again, however, the issue is not what motivated defendant to do what he did; it is whether he did it at all.

¶ 64　　　　In other words, whether the State's supposed objective in offering the other-crimes evidence is to show motive or intent, the evidence was relevant to this purpose only to the extent it showed defendant's *propensity* to commit the offense at issue here: some robbers commit brutal murders; defendant is a robber; therefore, defendant must have committed this brutal murder. See 1 McCormick on Evidence § 190.5 (8th ed. July 2022 Update) ("The motive theory should not apply *** when the 'motive' is so common that the reasoning that establishes relevance verges on ordinary propensity reasoning or when 'motive' or 'intent' is just another word for propensity." (Footnotes omitted.)). Because the State's other-crimes evidence was inadmissible to prove propensity and could only prove motive or intent by way of propensity, it was also inadmissible to prove motive or intent. As such, the trial court abused its discretion by admitting the other-crimes evidence for this purpose. See *People v. Mujkovic*, 2022 IL App (1st) 200717, ¶ 11 ("A trial court has no discretion to admit other-acts evidence to prove propensity.").

¶ 65　　　　Incredibly, the State responds by arguing that the other-crimes evidence was properly admitted for this purpose because *defendant* made intent an issue in his closing argument by "argu[ing] that in the 1994 case, the intent was to steal," not to kill. Of course, this argument reverses the timeline; defendant was forced to address the evidence of the 1994 robbery at the conclusion of the trial only because the State obtained admission of that evidence before trial. Defendant's clear preference was for the jury not to learn that he had committed the 1994 robbery, as shown by his opposition to the State's motion *in limine*. It was only after that motion was granted on the issue of "motive" that defendant endeavored to use the State's evidence of the 1994

robbery against it on that very same issue. Defendant's subsequent effort to make the best of this unfavorable ruling does not foreclose him from challenging it on appeal.

¶ 66                                      b. Identity

¶ 67          The identity of the person who committed the offense is always a material fact because "it is one of two propositions the State must prove beyond a reasonable doubt to obtain a valid conviction." *People v. Lara*, 2012 IL 112370, ¶ 17. When the defendant disputes that he was the person who committed the charged crime, the State may be able to introduce evidence that the defendant committed another crime, which enables the jury to infer that the defendant committed the charged crime. To prevent the jury from drawing the forbidden propensity inference, however, the State must make a threshold showing that *the same person* committed both crimes. In this case, the propensity-free chain of reasoning would be as follows: defendant committed the 1994 robbery; the same person who committed the 1994 robbery committed the 2019 robbery; therefore, defendant committed the 2019 robbery.

¶ 68          Before the adoption of the Illinois Rules of Evidence, courts referred to the two methods of making this threshold showing as "identification" and "*modus operandi*." *People v. Richardson*, 123 Ill. 2d 322, 339 (1988). Now, Rule 404(b)'s reference to "identity" encompasses both methods, which might be called "identity by way of an evidentiary link" and "identity by way of *modus operandi*." Nevertheless, there still remains a significant difference between these methods. See *People v. Leach*, 2012 IL 111534, ¶ 66 n.1 ("The Illinois Rules of Evidence *** codify the preexisting common law rules of evidence.").

¶ 69          Establishing identity by way of a common evidentiary link between the other crime and the charged crime requires the proponent of the other-crimes evidence to (1) introduce a piece of evidence tending to show that the same person committed both crimes and (2) show "mere

general areas of similarity" between the crimes. *People v. Wilson*, 214 Ill. 2d 127, 140 (2005); see 1 McCormick on Evidence § 190.3 (8th ed. July 2022 Update) ("[E]ven a few sufficiently individuating common aspects could mark the defendant as the likely perpetrator of both crimes."). Once the crimes are linked in this way, evidence that the defendant committed the other crime tends to show that he also committed the charged crime.

¶ 70       *Richardson* provides an illustrative example. There, the defendant was charged with murdering a liquor store clerk while committing an armed robbery on April 1, 1980. *Richardson*, 123 Ill. 2d at 333-34. The State introduced evidence that on April 5, 1980, at a bar approximately one mile away from the liquor store, the bar's owner was robbed and shot with a bullet from the same gun, although the gun itself was never recovered. *Id.* at 335-36. Although the defendant "maintain[ed] that significant differences existed between the April 1 and April 5 crimes" and "speculat[ed] that the same gun could have been passed from one person to another," the supreme court found that "in light of the evidentiary links between the two crimes," *i.e.,* matching bullets, "[t]estimony that [the] defendant was the man holding that particular weapon during a solo armed robbery on April 5 [was] clearly relevant to the determination of whether he was the man holding the weapon on April 1, when it was used to kill [the murder victim]." *Id.* at 339-40.

¶ 71       To establish identity by way of *modus operandi*, however, the State must account for the lack of an evidentiary link by showing "a higher degree of similarity between the facts of the crimes charged and the other offenses is required." *Wilson*, 214 Ill. 2d at 140. Although "some dissimilarity between the crimes will always be apparent" (*id.*), "[m]uch more is demanded than the mere repeated commission of crimes of the same class, such as serial murders, robberies or rapes" (footnotes omitted) (1 McCormick on Evidence § 190.3 (8th ed. July 2022 Update)).

¶ 72       This court found the higher *modus operandi* standard was satisfied in a robbery case presenting the following facts:

> "All three crimes took place at apartments in Cicero in the early afternoon. Each involved the theft of cash from an elderly woman who lived alone, although two occurred during a visit from the woman's elderly sister. In each case these three codefendants entered the apartment under the guise of doing some kind of repair work, two of the three incidents involving a request for water. No repairs were ever made. In each case, one man would attempt to distract each woman. As previously noted, the crimes occurred within approximately a four-month period, two being only two weeks apart. While we acknowledge that access to a residence is often gained by posing as a repairman, we do not think that the similarities in this case are of the type common to most residential burglaries." *People v. Miller*, 254 Ill. App. 3d 997, 1013 (1993).

In light of these similarities, this court upheld the use of identification evidence from one of the incidents to prove the codefendants' identities in the other incidents. *Id.*.

¶ 73       To recap, the State is required to show (1) one strong evidentiary link between the offenses along with a few weaker links in the form of shared characteristics or (2) a much tighter match in terms of those shared characteristics. Here, the State failed to supply any evidentiary link between the 1994 and 2019 robberies, showing merely alleged factual similarities, leaving *modus operandi* as the only way the State could use the other-crimes evidence to establish defendant's identity. See *People v. Clark*, 2015 IL App (1st) 131678, ¶ 51. Therefore, if the trial court found the evidence admissible by anything short of the standard for *modus operandi*, it necessarily abused its discretion.

¶ 74                                c. *Modus Operandi*

¶ 75        As noted above, Rule 404(b) speaks only of "identity" without specifically mentioning *modus operandi*, and the trial court is not required to make a formal statement of reasons when it exercises its discretion. Because "identity" now encompasses *modus operandi* (see *id.* ¶ 52), a court may admit evidence for the non-propensity purpose of proving identity without formally stating that it is relying on the specific theory of *modus operandi*, provided the record is adequate to enable us to review that decision. See *Ortega*, 209 Ill. 2d at 360. If we were confident from the record that the 1994 offense and the charged offense shared a high degree of similarity, we might find that its admission of the other-crimes evidence to prove "identity" could still be sustained on a theory of *modus operandi.* See, *e.g.*, *Miller*, 254 Ill. App. 3d at 1013. Under the circumstances of this case, however, we decline to uphold the trial court's ruling on a basis that the State explicitly disavowed when seeking that ruling.

¶ 76        According to the State, "[d]efendant should not be heard on appeal to argue that the two offenses only had minimal factual similarities" in light of his concession at the hearing that the offenses were factually similar. Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that it was error to proceed in that manner. *People v. Denson*, 2014 IL 116231, ¶ 17.

¶ 77        There are two fatal deficiencies in the State's effort to invoke the doctrine of invited error. First, the discussion of this issue below began with the State's representation that it did not need to satisfy the higher degree of similarity necessary for a theory of *modus operandi* and was not attempting to do so; the State, like defendant, may be estopped from relying on a directly conflicting theory on appeal. See, *e.g.*, *People v. Franklin*, 115 Ill. 2d 328, 336 (1987) (declining to affirm on a theory that "directly conflict[ed] with the State's theory at the pretrial hearing").

Second, it was only *after* this representation by the State that defense counsel conceded that the offenses were similar rather than arguing that the general areas of similarity were insufficient to satisfy *modus operandi*. *Cf. People v. McAdrian*, 52 Ill. 2d 250, 254 (1972) ("The failure to urge a particular theory before the trial court will often cause the opposing party to refrain from presenting available pertinent rebuttal evidence on such theory."). As between the two parties, the State played a greater role than defendant in inviting the court to admit the evidence based on "minimal factual similarities." Therefore, the State will not be heard on appeal to argue that the two offenses actually had a great deal of factual similarities.

¶ 78        In addition, we note that when the State initially sought admission of the 1994 offense, the focus of its arguments on similarity was the fact that both incidents involved a robbery. At the hearing on the motion *in limine*, the State specifically said, "[W]e *** want to use it as evidence of motive, that the reason this crime was committed was with the intent to commit a robbery. *** [W]e do think establishing a motive helps provide the jury with some context and gives them the theory of the State's case." By the time of trial, however, the State's own witness knocked the legs out from this contention, stating that the occurrence in question was *not* a robbery. We cannot discern from the record when this information came to the State's attention or when it decided to change tactics, but there was no way for defendant to know at the pretrial hearing that the State's claim regarding its theory of the case would later prove false; therefore, defendant cannot be said to have acquiesced in this claim. In these circumstances, "[t]o permit [the State] to use the exact ruling or action procured in the trial court as a vehicle for [affirmance] on appeal would offend all notions of fair play [citation] and encourage [the State] to become duplicitous." (Internal quotation marks omitted.) *People v. Harvey*, 211 Ill. 2d 368, 385 (2004).

¶ 79      In short, we decline to consider whether the trial court's ruling could be sustained on a theory of *modus operandi* because the State is estopped from relying on that theory.

¶ 80                                    3. *Harmless Error*

¶ 81      According to defendant, reversal is appropriate unless the State can show beyond a reasonable doubt that the trial court's error was harmless. See *Chapman v. California*, 386 U.S. 18, 24 (1967). Defendant is incorrect; *Chapman*'s constitutional harmless error standard applies only to violations of a federal constitutional right (see *id.* at 22), and defendants have no constitutional right to the exclusion of propensity evidence. See *Donoho*, 204 Ill. 2d at 177. Instead, "[a] nonconstitutional evidentiary error is harmless if there is no reasonable probability that the jury would have acquitted the defendant absent the error." *People v. Forrest*, 2015 IL App (4th) 130621, ¶ 57; see *In re E.H.*, 224 Ill. 2d 172, 180 (2006) ("[T]here is a somewhat higher bar for constitutional error.").

¶ 82      Defendant points out that even under this standard, "[t]he erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *Lindgren*, 79 Ill. 2d at 140. Here, the risk is that the jury entertained a reasonable doubt that defendant committed this crime but resolved that doubt in favor of conviction because defendant "is a bad person deserving punishment." *Donoho*, 204 Ill. 2d at 170. Therefore, the key question is whether the properly admitted evidence of defendant's identity was "so overwhelming that no fair-minded jury could have voted for acquittal." *Lindgren*, 79 Ill. 2d at 141. We conclude that the evidence in this case clears that high bar.

¶ 83      The evidence against defendant was substantial. Bricker was stabbed in the heart with scissors containing a copious amount of what was unquestionably defendant's DNA. Although he no longer lived next door to the victim, he admitted seeing her at her residence shortly

before she was found dead. In the face of this evidence, defendant weaves a complex alternative hypothesis. He may have innocently touched items of the victim's property on two occasions and his DNA may have transferred to the very scissors the real culprit used to murder the victim. While the State's expert testified that such transference of DNA is possible, she offered little in terms of the mechanics of this process or its likelihood. Moreover, defendant's DNA was also found on the washcloth outside of the victim's home, and his improbable bad luck becomes even more so: did the actual killer also just happen to take an innocently contaminated washcloth outside the home after the killing? Add to this the coincidence of defendant having researched unsolved murders in Sangamon County.

¶ 84      A criminal defendant's DNA on the murder weapon is very strong evidence, but it is not immune to innocent explanation. The innocent explanations offered up here, however, require the threading of several small needles in sequence. Fair-minded jurors are not required to suspend their disbelief in such contrivances when faced with overwhelming evidence that the primary suspect is the true culprit. The ability to conjure up some alternative hypothesis, regardless of how unlikely, is insufficient to overcome the strength of the evidence in this case.

¶ 85      This is true regardless of the State's failure to establish a motive. The unanswered question in this case is not why *defendant* brutally murdered an 80-year-old woman for no personal gain, but why *anyone* would commit such a heinous act. The logical consequence of defendant's motive argument is that unlike him, some unknown assailant must somehow have had a reason for killing Bricker, but this bare speculation does not rise to the level of reasonable doubt. See *In re M.L.*, 232 Ill. App. 3d 305, 308 (1992) ("The court was not required to acquit respondent solely on the basis of respondent's speculation that some other person might have had an opportunity to commit the crime."). To be sure, juries have sometimes assigned blame for senseless, unexplained

- 25 -

crimes on prior offenders who were in the wrong place at the wrong time; for this reason, the legislature has provided a means for defendants to obtain forensic DNA testing to challenge guilty convictions. See 725 ILCS 5/116-3 (West 2022). Here, however, we face forensic evidence that overwhelmingly suggests defendant killed Bricker. On the facts of this case, we conclude that no fair-minded jury would have cast aside that evidence and acquitted defendant.

¶ 86      The upshot of our conclusion is that the State's introduction of overwhelming forensic evidence rendered its introduction of the other-crimes evidence unnecessary—indeed, the State argues as much in its brief. We emphasize that the State's meticulous efforts with the forensic evidence could easily have been undone by its failure to show a similar degree of care in handling the other-crimes evidence; however, this case presents the relatively rare situation when that outcome is not warranted.

¶ 87                    B. The Trial Court's Question at *Voir Dire*

¶ 88      Defendant also argues that the trial court erred by using the word "sociopath" during *voir dire*. As an initial matter, we expect the potential jurors thought nothing of the court's colloquial use of "sociopath." In context, it appears that the court was illustrating to the jurors that, at that point, it was probing only for serious disqualifications from jury service; if anything, it appears as if it may have been said lightheartedly. We agree that it was likely a poor choice of words in this first degree murder prosecution, and trial courts should understand that an attempt at levity that passes without note in the courtroom may come across quite differently in a cold transcript. We will therefore briefly entertain defendant's argument. See *People v. Vargas*, 174 Ill. 2d 355, 365 (1996) ("[The trial court's] lightest word or intimation *** may prove controlling." (Internal quotation marks omitted.)).

¶ 89 Defendant concedes that he did not contemporaneously object to the trial court's alleged error or raise it in a posttrial motion, resulting in forfeiture of the issue. See *People v. Sebby*, 2017 IL 119445, ¶ 48. Defendant argues that we should relax the forfeiture rule on several grounds, but we need not address forfeiture because defendant would not be entitled to relief even if he had preserved the alleged error. See *People v. Hood*, 2016 IL 118581, ¶ 18.

¶ 90 "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). The supreme court has explained the relevant standard as follows:

> "Because there is no precise test for determining which questions will filter out partial jurors [citation], the manner and scope of the examination rests within the discretion of the trial court, and we review such decisions for an abuse of discretion. An abuse of discretion occurs when the conduct of the trial court thwarts the purpose of *voir dire* examination—namely, the selection of a jury free from bias or prejudice. [Citations.] Stated differently, a trial court does not abuse its discretion during *voir dire* if the questions create a reasonable assurance that any prejudice or bias would be discovered." (Internal quotation marks omitted.) *People v. Rinehart*, 2012 IL 111719, ¶ 16.

¶ 91 Defendant argues that we lack such a reasonable assurance here because the trial court's use of the word "sociopath" chilled honest responses from the potential jurors. Defendant's only support for this claim is that none of the potential jurors who were asked this question "came forward to answer any of the other, legitimate questions the court posed about sympathies and biases and prejudices *just before* the so called joke." (Emphasis added.) However, defendant fails to acknowledge any of the *subsequent* questions by the trial court or the attorneys, nor does

- 27 -

defendant address the fact that the potential jurors candidly addressed their sympathies, biases, and prejudices in response to those questions and that some were stricken for cause. Absent any indication in the record of this alleged chilling effect, defendant's speculative claim fails. See *People v. Ingram*, 409 Ill. App. 3d 1, 18 (2011) (finding no error when "contrary to [the] defendant's claim, the responses of the challenged venire members, as well as the remaining venire members, demonstrate they were not intimidated by the judge's comments").

¶ 92    In short, our review of the trial court's *voir dire* creates a reasonable assurance that any bias would have been discovered; therefore, defendant has failed to show error.

¶ 93                                   III. CONCLUSION

¶ 94    For the reasons stated, we affirm the trial court's judgment.

¶ 95    Affirmed.