NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240592-U

NO. 4-24-0592

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 28, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| JEREMY J. MOORE JR., | ) | No. 21CF700 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul P. Gilfillan, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed defendant's 80-year sentence for first degree murder, finding that the record was not sufficiently developed to address defendant's proportionate penalties clause (Ill. Const. 1970, art. I, § 11) and ineffective assistance of counsel claims and the trial court did not abuse its discretion at sentencing.

¶ 2    Defendant, Jeremy J. Moore Jr., was convicted of first degree murder, and the trial court sentenced him to 80 years in prison. He appeals his sentence, arguing that it violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) and the court abused its discretion. Defendant emphasizes that he was only 18 years old when he committed the murder, and he suffered from severe lead poisoning as a child. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    In 2021, the State charged defendant with two counts of first degree murder and one count of aggravated battery. 720 ILCS 5/9-1(a)(1), (2) (West 2020); *id.* § 12-3.05(e)(1). The

State alleged that, on October 6, 2021, defendant personally discharged a firearm at Jerry Snipes, either intending to kill Snipes or knowing that his acts created a strong probability of death or great bodily harm. Defendant pled not guilty. The State dismissed the aggravated battery charge, and the case proceeded to trial.

¶ 5        At trial, witnesses from the Peoria Police Department testified that early in the morning on October 6, 2021, Snipes was found on a sidewalk near Linn Street in Peoria, Illinois. His back was covered in bullet holes. Snipes died from his injuries, which included one shotgun wound and nine other gunshot wounds. Sometime after the shooting, police located a dark green Nissan with dried blood near the door handle.

¶ 6        Officers canvassed the area around the crime scene for security camera footage, and they assembled multiple recordings from the time of the shooting. Those recordings showed a white sedan driving in the area on the morning of the shooting. One residence's security video showed a white sedan drive past, shortly after 4:30 a.m., followed soon after by a dark-colored vehicle. A woman walked to the residence's driveway, talked on her phone, and then left. Moments later, multiple gunshots were audible, followed by one final shot a few moments later.

¶ 7        Two witnesses described what happened that morning. First, Tyranique White testified that she was with Snipes on October 6, 2021, in her mother's car, the dark green Nissan. Her friend, Gary Irby, told her to go to Linn Street. When she and Snipes arrived, she got out of her car and called Irby. White heard Snipes call her name, and then she saw somebody in the car wrestling with him. She heard gunshots, went to see what happened, and saw Snipes on the ground. White testified she saw two people run away and one was holding a "long gun." She fled to Irby's house on Frye Street, where she saw a white car, which she also saw on Linn Street.

¶ 8        The State also presented testimony from Hanna Hermancinski. Hermancinski was

shown a picture of a white car, and she confirmed the vehicle in the picture was her 2009 Chrysler 300. She testified that, on the morning of the shooting, defendant called her and asked her to pick him up at Irby's house on Frye Street. She drove defendant and Irby around, eventually stopping on Linn Street. Irby told her to drive around the block. Defendant and Irby exited the car, and defendant told her that if she left, he would kill her. He took a "big shotgun" with him. A few seconds later, Hermancinski heard gunshots. Defendant and Irby ran back to the car and told her to go. They drove back to Irby's house, and Hermancinski saw another car there, which she had seen on Linn Street as well.

¶ 9        Finally, the State introduced evidence to prove defendant's location when the shooting occurred. At the time of the shooting, both defendant and Irby were on probation, and probation officers had placed GPS monitors on their ankles. Detective Clint Rezac testified that he used a computer program to map defendant's and Irby's GPS locations, as recorded by their monitors. Detective Rezac described Irby's and defendant's movements on the morning of the shooting, testifying that they were on Linn Street, near the crime scene, at 4:39 a.m. By 4:50 a.m., they were very close to or inside a residence on Frye Street.

¶ 10       The jury found defendant guilty of first degree murder. The jury also found that defendant personally discharged a firearm that proximately caused death or great bodily harm to another.

¶ 11       Defendant's presentence investigation report (PSI) detailed his history of juvenile delinquency, including delinquency adjudications for two aggravated batteries, robbery, aggravated battery with a deadly weapon, multiple aggravated batteries of peace officers, unlawful possession of a handgun, possession of a stolen firearm, and armed robbery. The PSI also listed school disciplinary infractions, such as "threats/bullying," arson, and "aggressive acts towards

staff." The PSI included a section on defendant's health. It stated, "The defendant reported he was diagnosed with Lead Poisoning at age two and was hospitalized several times as a young child." Defendant reported diagnoses of attention-deficit/hyperactivity disorder (ADHD), depression, and somnambulism. He received treatment for a mood disorder and bipolar disorder.

¶ 12 Almost 200 pages of records were attached to the PSI. These included disciplinary records from the Peoria County jail, school transcripts and disciplinary reports, a family questionnaire completed by defendant's mother, medical records, and a victim impact statement from Snipes's mother. The school records indicated that defendant qualified for special education services because of "a history of extremely high lead levels" and that, when defendant was 14 years old, his listening comprehension skills were at a third-grade level.

¶ 13 At defendant's sentencing hearing, the State argued that this was a "cold, calculated murder." Based on a series of pops followed by one louder "boom" at the end of the security camera video and the fact that defendant carried the shotgun, the State argued that defendant fired a shotgun into Snipes's back as he lay on the ground. The State also emphasized defendant's criminal history, especially the consistent use of "violence and guns." It commented that, reading through the PSI, "it's difficult to find a single redeeming quality of this man."

¶ 14 Considering this comment, the trial court asked defense counsel, "Is there anything in this PSI from—in a show of support for your client?" Defense counsel responded that the PSI indicated defendant played football at school. The court asked if there were any letters of support or anything similar. Defense counsel answered, "No, Your Honor."

¶ 15 Defense counsel began her argument by noting defendant was 21 years old at the time of sentencing and 18 years old at the time of the offense. She argued defendant "did not have a single, consistent, positive role model in his life." He had multiple diagnoses, including "a mood

disorder, ADHD, as well as lead poisoning."

¶ 16        Defense counsel also highlighted *Miller v. Alabama*, 567 U.S. 460 (2012), and *People v. Buffer*, 2019 IL 122327. She conceded those cases were not directly applicable, but she noted, "had [defendant] been a year younger or so we would be at a different sentencing range." She contended that a life sentence would be cruel and unusual. She argued that the trial court should consider defendant's maturity, especially his interest in treatment, training, and education. She recommended a sentence of 45 years.

¶ 17        The trial court observed that there were no letters of support, but defendant's mother had filled out a questionnaire. The court stated, "I've considered the [PSI], the arguments of the attorneys. I've considered all of the statutory factors in aggravation and mitigation even if they haven't been mentioned specifically here today." It then reviewed specific statutory factors. The court agreed with the State that there were hardly any mitigating factors.

¶ 18        Summarizing the circumstances of the murder, the trial court explained, "[D]efendant was part of a three person team that planned and carried out the ambush and execution of Mr. Snipes. So, it was not a spur of the moment, even though, intentional murder. It was a planned intentional murder."

¶ 19        Moving to aggravating factors, the trial court specifically noted, "I'll be careful not to, in my sentence today, provide a more harsh sentence just because there's a murder involved. That's already taken into account in the statutory scheme and the sentencing range that's in play here today. It's 45 years minimum. It's life at a maximum." The court found that defendant's conduct caused serious harm, highlighting the police body camera footage showing Snipes's condition when police arrived.

¶ 20        Besides the nature and circumstances of the offense, the trial court also treated

defendant's "deplorable" history as an aggravating factor. His juvenile record, although not technically "criminal," was still a long, extensive, and consistent record of violence and guns. His school records documented "100 or more incidents of insubordination, threats, intimidation, bullying, actual physical violence." The court added that its sentence was necessary to deter others.

¶ 21 The trial court acknowledged that, if defendant had committed this offense a year earlier, the sentencing would have been more favorable to him. It also stated:

"And here is also another example of the maxim not set in any particular statute, of course, but just in the world of practical reality that when a person takes a life, you usually give up a life, and so it will be in this case. No matter the sentence imposed here today, your life is effectively over as you knew it. Your likelihood of breathing free air again is slim and none even with the bare minimum, and you cannot get the bare minimum sentence in this case given the chilling and diabolical nature of the offense and all of the surrounding circumstances in aggravation."

¶ 22 Even though defendant was over 18, the trial court still considered factors relevant to youthful offenders. It explained that defendant was not far from a juvenile and a person that young "has a certain level of impetuosity and immaturity and lacks the ability to consider risks and consequences of behavior." But, the court told defendant:

"Here, that does not play out. Your behavior before this offense showed that you took actions, and they involved risks and involved consequences. I'm struck about how many times you  might have hit somebody in school maybe a fellow student or a teacher. And then the next entry is defendant violated school policy, so he's suspended for one day from school. Amazing."

¶ 23 The trial court also considered peer pressure, noting that young people often behave

- 6 -

with others in ways that they would not behave on their own. The court stated:

> "I can't really say that applies here too because you were as much a part and parcel in this planning process as any of the two participants in the crime were as well. So, in terms of peer pressure in this case you were part of the peer pressure that grouped together for this offense to occur."

¶ 24      Regarding defendant's "home environment and background," the trial court commented, "If there's any scintilla of evidence showing some mitigation and favorable factors for you today, it's that. But I've seen so much worse of upbringings involving beatings, abuse, neglect, 20 foster homes, you name it. I don't see that stand out in this case." The court found rehabilitation was not likely. Ultimately, the court sentenced defendant to 80 years in prison.

¶ 25      Defendant filed a motion to reconsider. The motion cited *Miller*'s holding that mandatory life without parole for juveniles violates the eighth amendment to the U.S. Constitution (U.S. Const., amend. VIII). See *Miller*, 567 U.S. at 494. It also cited *Buffer*'s holding that a prison sentence of more than 40 years for a juvenile constitutes a *de facto* life sentence. See *Buffer*, 2019 IL 122327, ¶ 41. The motion conceded that defendant was not a juvenile but argued that these cases' "discussion of young offenders having the opportunity to be rehabilitated should be considered in [defendant's] case." The trial court denied defendant's motion, stating that it had considered defendant's age at sentencing.

¶ 26      This appeal followed.

¶ 27      II. ANALYSIS

¶ 28      Defendant asks us to vacate his sentence and either impose a shorter sentence or remand for resentencing, with instructions that the statutory 45-year mandatory minimum sentence should not apply. He raises two arguments: first, he argues that his sentence violated the

proportionate penalties clause of the Illinois constitution; second, he argues the trial court abused its discretion by imposing an excessive sentence.

¶ 29                                   A. Proportionate Penalties

¶ 30        We begin with defendant's constitutional argument. Article I, section 11 of the Illinois Constitution states, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates this provision if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002). Defendant claims that his sentence violated the proportionate penalties clause as it applies in this case. "An as-applied constitutional challenge is a legal question that we review *de novo*." *People v. Spencer*, 2025 IL 130015, ¶ 25.

¶ 31        Here, the mandatory minimum sentence for first degree murder was 20 years in prison. 730 ILCS 5/5-4.5-20(a)(1) (West 2020). The Unified Code of Corrections (Code) further imposed a mandatory 25-year firearm enhancement, resulting in a total mandatory minimum sentence of 45 years in prison. *Id.* § 5-8-1(a)(1)(d)(iii). The trial court sentenced defendant to 80 years in prison. However, under section 5-4.5-115(b) of the Code, defendant is eligible to apply for early release after he has served at least 20 years of his sentence. See *id.* § 5-4.5-115(b).

¶ 32        Defendant relies on *People v. Harris*, 2018 IL 121932. There, the defendant was 18 years old when he committed first degree murder, attempted first degree murder, and aggravated battery with a firearm. The trial court sentenced him to the mandatory minimum 76-year term of imprisonment. *Id.* ¶ 1. On appeal, the defendant claimed that his sentence violated the proportionate penalties clause because it "shock[ed] the moral sense of the community to impose a mandatory *de facto* life sentence," considering his youth and other mitigating factors. *Id.* ¶ 36.

He argued that the United States Supreme Court's decision in *Miller*, which held that the eighth amendment to the U.S. Constitution prohibits mandatory life sentences without the possibility of parole for juveniles, should be extended to his case because he was only 18 years old. *Id.* ¶ 37; see *Miller*, 567 U.S. at 471-72 (reasoning that science and social science studies demonstrated that juvenile minds differ from adult minds in their "transient rashness, proclivity for risk, and inability to assess consequences" and these differences reduced juveniles' responsibility and increased their prospects of rehabilitation).

¶ 33 The Illinois Supreme Court found that the defendant had not raised his as-applied constitutional challenge before the trial court, so the record was not sufficiently developed to address his arguments. *Harris*, 2018 IL 121932, ¶ 40. The supreme court explained, "All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge." *Id.* ¶ 39. The record contained "only basic information about [the] defendant, primarily from the [PSI]." *Id.* ¶ 46. It did not include "evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to defendant's specific facts and circumstances." *Id.* Without an evidentiary hearing and findings of facts on the defendant's claims, appellate review was premature.

¶ 34 Nevertheless, the *Harris* court did not hold that the defendant's sentence satisfied the proportionate penalties clause. Instead, the court found that the defendant could still raise his claim through a petition for postconviction relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)) or a petition seeking relief from a final judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)). *Harris*, 2018 IL 121932, ¶ 48.

¶ 35        Here, defendant claims that the record is sufficiently developed in precisely the manner that was lacking in *Harris*. Defendant's trial counsel emphasized defendant's youth at sentencing and in a motion to reconsider, and the trial court specifically discussed factors related to youth in explaining its sentence. Moreover, school and medical records attached to the PSI documented defendant's lead poisoning diagnosis, as well as diagnoses of ADHD, bipolar disorder, and a mood disorder. Those records indicated that defendant qualified for special education programs because of his high lead levels. They also showed that, when defendant was 14 years old, his listening and comprehension skills were at only a third-grade level. Defendant asks us to take judicial notice of Environmental Protection Agency (EPA) and Center for Disease Control (CDC) websites detailing the harmful effects of lead exposure on children's development.

¶ 36        Based on these sources, defendant insists that his sentence violated the proportionate penalties clause. He was 18 years old when he committed this murder, only barely beyond *Miller*'s range, and he characterizes himself as an "emerging adult." Because of his youth and his mental and psychological delays or disorders, he argues that *Miller*'s prohibition on mandatory life sentences without parole for juveniles extends to his case. He claims that the 45-year mandatory minimum in this case constituted an improper mandatory *de facto* life sentence. See *Buffer*, 2019 122327, ¶¶ 41-42 (holding that a prison sentence of over 40 years constitutes a *de facto* life sentence for juveniles). He further claims that his 80-year sentence " 'shock[s] the moral sense of the community' " (quoting *Leon Miller*, 202 Ill. 2d at 338). He concludes that the proportionate penalties clause requires resentencing without the mandatory minimum of 45 years.

¶ 37        Initially, we reject defendant's claim that his sentence was a *de facto* life sentence. In *Spencer*, 2025 IL 130015, ¶ 35, the defendant's convictions resulted in an aggregate mandatory minimum sentence of 72 years in prison. However, because the defendant was under 21 years old

when he committed the offenses, the Code provided that he would be eligible for parole review after serving at least 20 years of his sentence. *Id.* (citing 730 ILCS 5/5-4.5-115(b) (West 2020)). The supreme court found that this eligibility provided the defendant "a meaningful opportunity to obtain release before he spends 40 years in prison," so his sentence was not a *de facto* life sentence. *Id.* ¶ 40. The same reasoning applies here. After defendant serves at least 20 years of his sentence, he will be eligible for parole review under the same provision cited in *Spencer*. Therefore, his 80-year sentence was not a *de facto* life sentence, and the mandatory minimum 45-year sentence was not a mandatory *de facto* life sentence.

¶ 38         Of course, even sentences that do not constitute *de facto* life sentences can violate the proportionate penalties clause. As *Spencer* noted, "Notwithstanding the fact that [the defendant] is not serving a *de facto* life sentence, he is not foreclosed from bringing an as-applied challenge to his sentence pursuant to the Illinois proportionate penalties clause." *Id.* ¶ 42. Neither *Spencer*, nor *Harris*, nor any other case directly addresses defendant's claim that his particular 80-year sentence "shock[s] the moral sense of the community." Indeed, this claim depends on the unique facts of this case.

¶ 39         However, courts have emphasized that the record must be sufficiently developed to address such as-applied challenges. See *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004) ("A court is not capable of making an 'as applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact."); see also *People v. Mosely*, 2015 IL 115872, ¶ 49 ("When there has been no evidentiary hearing and no findings of fact, the constitutional challenge must be facial."). Indeed, courts have reiterated this requirement even in the specific context of proportionate penalties arguments based on *Miller* or the developing brains of young adults. See *Harris*, 2018 IL 121932, ¶ 46; see also *People v. McKee*, 2017 IL App (3d)

140881, ¶¶ 34-35 (acknowledging that "the 18-year-old brain, even without trauma, is not fully mature" and that the defendant's "personal history includes significant mental health issues and at least two extended and extremely tragic and traumatizing experiences as a 14-year-old" but nevertheless concluding that the record was not sufficient to consider an as-applied challenge based on *Miller*); *People v. Landerman*, 2018 IL App (3d) 150684, ¶ 56 (finding the record insufficient to allow review of the defendant's as-applied argument, even though the PSI included information on the defendant's mental illness and "susceptibility to peer pressure," because "there was no sworn testimony or factual findings regarding these matters").

¶ 40 The record here is insufficient. As in *Harris*, defendant's trial counsel did not raise an as-applied challenge before the trial court, and the written PSI does not provide a sufficient basis for us to rule on defendant's claims on appeal. See *Harris*, 2018 IL 121932, ¶ 46. As in *Landerman*, written documentation in a PSI showing defendant's mental impairments does not eliminate the need for sworn testimony and factual findings specifically addressing the basis of the as-applied challenge. See *Landerman*, 2018 IL App (3d) 150684, ¶ 56. The records attached to the PSI here are not enough to distinguish this case from *Harris* and *Landerman*. No witnesses testified regarding these documents or regarding defendant's diagnoses. Furthermore, although the court made some factual findings in announcing its sentence, because defendant's attorney did not raise this as-applied challenge and no witnesses were called, the court's factual findings did not address the basis for that challenge.

¶ 41 Alternatively, defendant argues his trial attorney was ineffective. Criminal defendants have a right to effective assistance of counsel, including at sentencing. U.S. Const., amends. VI, XVI; Ill. Const. art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984). To show that he was denied effective assistance of counsel, a defendant must show that "counsel's

performance fell below minimal professional standards and that a reasonable probability exists that the sentence was affected by the poor performance." *People v. Steidl*, 177 Ill. 2d 239, 257 (1997).

¶ 42 Defendant claims that his attorney should have raised his as-applied challenge and sufficiently developed the record for us to review that claim. He argues that his attorney had no strategic reason to refrain from presenting mitigating evidence, such as evidence of the effects of lead poisoning. He also claims that this failure prejudiced him. His sentence was 35 years over the mandatory minimum, and the trial court relied on defendant's history of juvenile delinquency to impose a longer sentence. Defendant contends that there is a reasonable probability that the court would have found this history less significant if his attorney had provided evidence of brain development in children and young adults and of lead poisoning's effect on that development.

¶ 43 Defendant cites *People v. Gates*, 2023 IL App (1st) 211422, and *People v. Estrada*, 2024 IL App (1st) 230029-U. In *Gates*, 2023 IL App (1st) 211422, ¶ 1, the defendant committed first degree murder when he was 18 years old. He was sentenced to 23 years' imprisonment for the murder, plus an additional 25-year firearm enhancement, with the possibility of parole after 20 years. *Id.* ¶ 22. On appeal, the defendant argued that his sentence was a *de facto* life sentence that violated the proportionate penalties clause. *Id.* ¶ 36. He further argued that his attorney was ineffective. *Id.* ¶¶ 64-70. The appellate court agreed, finding that his attorney "failed to advocate for a lesser sentence under the proportionate penalties clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 11), given the developments on emerging adults in the criminal justice system." *Id.* ¶ 66. The court further found that defendant was prejudiced by this deficient performance because the trial court "might have lowered the length of the sentence" if it were not for trial counsel's failures, particularly because the trial court appeared reluctant to apply the

firearm enhancement. *Id.* ¶ 69; see *Estrada*, 2024 IL App (1st) 230029-U, ¶¶ 50, 56 (finding the defendant's attorney was ineffective in failing "to present any evidence whatsoever regarding the defendant's developmental maturity at the time of the offense" and that, if the court had heard such evidence, there was a reasonable probability that it would have imposed a lesser sentence). Defendant argues that here, as in *Gates* and *Estrada*, if his attorney had introduced evidence regarding brain development, emerging adults, and lead poisoning, the trial court would have imposed a lesser sentence.

¶ 44 Once again, this argument is premature. We cannot evaluate whether defendant was prejudiced by trial counsel's failure to introduce mitigating evidence without knowing what testimony or other evidence counsel could have provided. Moreover, whatever witnesses defense counsel could have called would be subject to cross-examination from the State, and the State would have the opportunity to challenge or refute any evidence defense counsel might introduce. This also could affect the trial court's ruling. Defendant may be correct that testimony and evidence showing how lead poisoning impeded his development or influenced his history would have convinced the court to impose a lower sentence. But, as *Landerman* explained, "This argument is better suited to postconviction proceedings, where defendant may present any evidence that he believes counsel should have offered in support of an as-applied constitutional challenge to his sentence." *Landerman*, 2018 IL App (3d) 150684, ¶ 57; see *Harris*, 2018 IL 121932, ¶ 48.

¶ 45 *Gates* and *Estrada* do not convince us otherwise. First, *Spencer* explicitly overruled *Gates*, at least regarding the possibility of parole and *de facto* life sentences. *Spencer*, 2025 IL 130015, ¶ 40. Moreover, we are not persuaded by *Gates*'s analysis of the prejudice prong of ineffective assistance of counsel. In Justice Coghlan's partial dissent, she concluded that the majority's reasoning was speculative, and she cited our supreme court's admonition that " 'under

no circumstances can conjecture constitute the sole basis for a claim of prejudice.' ” *Gates*, 2023 IL App (1st) 211422, ¶ 91 (Coghlan, J., dissenting) (quoting *People v. Hannon*, 48 Ill. 2d 462 (1971)). We agree with this conclusion. *Estrada*'s reasoning suffers from a similar defect. See *Estrada*, 2024 IL App (1st) 230029-U, ¶ 71 (Coghlan, J., dissenting) (“Nothing in the record before us establishes that ‘absent trial counsel's alleged deficiencies, the sentencer *would have found* that the mitigating circumstances preclude’ the sentence imposed. (Emphasis added.)”) (quoting *People v. Griffin*, 178 Ill. 2d 65, 87 (1997)).

¶ 46        We reiterate that we are not ruling on the merits of defendant's proportionate penalties or ineffective assistance claims. Instead, we find only that we cannot assess these claims on this record. But defendant may raise them in a petition for postconviction relief, where he can provide the testimony and other evidence that he claims his attorney should have provided here.

¶ 47                                B. Abuse of Discretion

¶ 48        Next, defendant argues that his sentence was excessive. We afford a trial court's sentencing decisions great deference, and we will uphold those decisions on appeal unless the court abused its discretion. *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). We will not find an abuse of discretion when the trial court imposed a sentence within the statutory range unless that sentence was manifestly disproportionate to the nature of the offense. *Id.* We will not reverse a sentence simply because we “would have weighed the factors differently.” *Id.* at 801. However, “[t]he question of whether the trial court relied on an improper factor in imposing the defendant's sentence presents a question of law, which we review *de novo*.” *People v. Williams*, 2018 IL App (4th) 150759, ¶ 18. “There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court.” *People v.*

*Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22.

¶ 49 Defendant argues the trial court abused its discretion for four reasons. First, he claims that the court overemphasized the seriousness of the offense, which is already reflected in the 45-year mandatory minimum sentence. He cites *People v. Steffens*, 131 Ill. App. 3d 141, 151 (1985), to establish that the "legislature has determined that adequate retribution *** may be achieved by imposition of the minimum sentence." Furthermore, the seriousness of the offense is only one factor for the court to consider. Defendant insists that all the aggravating and mitigating factors, taken together, could not justify a sentence 35 years longer than the minimum 45-year sentence.

¶ 50 We disagree. The trial court expressly stated that it would "be careful not to *** provide a more harsh sentence just because there's a murder involved," noting, "That's already taken into account in the statutory scheme and the sentencing range that's in play here today." We see no reason to disregard this clear statement by the trial court that it would not further punish defendant based on the necessary elements of his offense.

¶ 51 The trial court could still properly consider the seriousness of defendant's offense. Indeed, "[t]he trial court *must* consider both the seriousness of the offense and the defendant's rehabilitative potential." (Emphasis added) *People v. Charles*, 2018 IL App (1st) 153625, ¶ 45; see Ill. Const. 1970, art. I, § 11. Moreover, "[t]he most important sentencing factor is the seriousness of the offense, and the court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense." *Charles*, 2018 IL App (1st) 153625, ¶ 45; *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 82. In *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 112, we observed that "the word 'offense,' in the phrase the 'seriousness of the offense,' means not the statutory offense in the abstract but the offense as committed by the defendant: the particular facts

and circumstances of the defendant's offense." *Steffens*'s statement about "adequate retribution" does not refute these sentencing principles. *Steffens*, 131 Ill. App. 3d at 151.

¶ 52 Here, the trial court clearly considered the particular facts of this offense. It characterized the murder as an "ambush and execution," adding, "it was not a spur of the moment." The court also emphasized the police body camera footage of Snipes after the shooting. In imposing a higher sentence based on these facts, the court rightly treated the seriousness of defendant's offense as the "most important sentencing factor." See *Charles*, 2018 IL App (1st) 153625, ¶ 45.

¶ 53 Second, defendant claims the trial court "showed improper disdain for the youthful offender factors." According to defendant, the court wrongfully disregarded young people's impetuousness and inability to consider consequences, stating, "Here, that does not play out. Your behavior before this offense showed that you took actions, and they involved risks and involved consequences." Defendant insists this statement is nonsense, arguing his past inability to consider consequences does not invalidate this factor. Additionally, defendant claims that the court's determination that he was not influenced by peer pressure because he participated in planning the murder was not based on the evidence. Finally, defendant argues that the court erred by dismissing the impact of his home environment and background. The court stated that it had "seen so much worse of upbringings." Defendant claims the court improperly "refused to consider" this factor because it had presided over more egregious cases.

¶ 54 We find no abuse of discretion. When the trial court determined that an inability to consider consequences was not a compelling mitigating factor here, it sensibly viewed defendant's long history of violent behavior as indicative of defendant's character. Defendant did not simply make one mistake without thinking about the consequences. He consistently acted violently. The

- 17 -

court's rejection of peer pressure was also reasonable. Hermancinski testified that defendant called her and told her to pick them up on the morning of the murder. Once they arrived on Linn Street, defendant told her he would kill her if she left, and he grabbed a shotgun. The court reasonably interpreted such testimony as showing defendant's active role in the murder. He was not simply following Irby's lead. Finally, the court clearly did not "refuse[ ] to consider" defendant's upbringing when it specifically acknowledged this factor. Indeed, it even found that this factor was more mitigating for defendant than any other factor, although not by much. Defendant simply argues that the court should have assigned this factor even more weight than it did. But we will not find an abuse of discretion simply because we would have weighed a factor differently. See *Jackson*, 375 Ill. App. 3d at 801.

¶ 55    Third, defendant contends the trial court improperly sentenced him based on its own rule for murders. At sentencing, the court told defendant, "[W]hen a person takes a life, you usually give up a life, and so it will be in this case." Defendant insists that the court applied "its own personal moral or philosophical rule" by imposing a life sentence in exchange for the life that defendant ended. Citing *People v. Bolyard*, 61 Ill. 2d 583, 587 (1975), he argues that such reasoning is not allowed at sentencing.

¶ 56    We do not find that the trial court sentenced defendant based on its own personal rule. Instead, it simply acknowledged the substantial likelihood that defendant would spend most of the rest of his life in prison. As noted above, the court specifically stated that it would not impose a harsher sentence simply because defendant committed murder. Nevertheless, the mandatory minimum sentence for his offense was 45 years in prison. In defendant's own brief, submitted before *Spencer* was decided, he himself relies on *Buffer*'s holding that a sentence over 40 years constitutes a *de facto* life sentence, at least if it is to be served without the possibility of parole.

See *Buffer*, 2019 IL 122327, ¶ 40. Recognizing that defendant necessarily faced a long prison sentence, the court commented, "*No matter the sentence imposed here today*, your life is effectively over as you knew it. Your likelihood of breathing free air again is slim and none *even with the bare minimum*." (Emphases added). The court did not follow its own personal rule of sentencing defendant to life in prison. Instead, it followed the legislature's determination that defendant must be sentenced to at least 45 years.

¶ 57        *Bolyard* is easily distinguishable. There, the defendant was convicted of indecent liberties with a child. *Bolyard*, 61 Ill. 2d at 585. This offense was eligible for probation, but the trial court sentenced the defendant to 6 to 18 years' incarceration. *Id.* At sentencing, the trial judge commented that judges in that courtroom formerly had an " 'inflexible policy' " of imposing prison sentences for all crimes involving sexual violence and increasing sentences when attorneys asked for probation in such cases, adding that he still followed that policy. *Id.* The Illinois Supreme Court ordered a new sentencing hearing, reasoning that "the trial judge arbitrarily denied probation because [the] defendant fell within the trial judge's category of disfavored offenders." *Id.* at 587.

¶ 58        Unlike in *Bolyard*, the trial court here never refused to even consider a statutorily permissible sentence. Instead, the court followed the legislature's determination that the minimum possible sentence was 45 years in prison. Although the court decided to impose a sentence higher than the minimum, explicitly invoking the aggravating circumstances of the offense, this was well within the court's discretion.

¶ 59        Finally, defendant claims the trial court failed to consider relevant mitigating factors. According to defendant, although the court discussed factors related to youthful offenders, it failed to consider his youth as indicative of greater rehabilitative potential. Likewise, the court did not discuss defendant's diagnoses of severe lead poisoning, ADHD, bipolar disorder, and a

mood disorder. Citing EPA and CDC websites, he relies on the well-known effects of lead poisoning on brain development. He concedes that "evidence of brain damage due to lead poisoning is not inherently mitigating." See *People v. Thompson*, 222 Ill. 2d 1, 43 (2006) ("A judge or jury considering evidence of [mental or psychological impairments] at sentencing might view the information as either mitigating or aggravating, depending, of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness."). But he insists the court abused its discretion by not finding the evidence of lead poisoning as a mitigating factor here because his diagnosis evokes compassion.

¶ 60 We find no reversible error. The trial court considered defendant's youth when it discussed factors relevant to youthful offenders. The court did not need to discuss youth again after discussing these factors. Although the court did not discuss defendant's diagnoses, it clearly stated that it considered all the relevant factors in aggravation and mitigation, even those it did not mention at the hearing. Moreover, defense counsel mentioned these diagnoses only once during argument, almost in passing. Furthermore, even if we were to take judicial notice of the EPA and CDC documents defendant cites, defense counsel did not present this information to the trial court. We will not find the court abused its discretion in failing to consider information that defense counsel never provided. Finally, as defendant acknowledges, the court need not necessarily treat a defendant's mental impairment as a mitigating factor. See *id.*; see also *People v. Ballard*, 206 Ill. 2d 151, 190 (2002) ("[I]nformation about a defendant's mental or psychological impairments is not inherently mitigating."). Therefore, in declining to treat defendant's mental or psychological impairments as mitigating, the court acted within its discretion, at least considering the information presented to it.

¶ 61 Defendant's sentence was within the statutory sentencing range, and he has not

convinced us that his sentence was manifestly disproportionate to the nature of his offense, so we affirm his sentence. See *Jackson*, 375 Ill. App. 3d at 800.

¶ 62                                    III. CONCLUSION

¶ 63         For the reasons stated, we affirm the trial court's judgment.

¶ 64         Affirmed.