NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 240920-U

NO. 4-24-0920

IN THE APPELLATE COURT

FILED
March 6, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | McLean County |
| KENTRELL D. BROWN, | ) | No. 21CF561 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | J. Jason Chambers, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Knecht and Grischow concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) Photographs of defendant with firearms were relevant and their admission was not error; (2) any error in the admission of other-crimes evidence was harmless; (3) defendant's proportionate penalties clause challenge is premature; and (4) the restitution order is fatally flawed and must be corrected by the trial court.

¶ 2     Following a jury trial, defendant Kentrell D. Brown was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)), and the trial court imposed an aggregate sentence of 80 years' imprisonment. In this direct appeal, he argues that (1) he was denied a fair trial where the State was allowed to introduce improper other-crimes evidence, (2) his sentence violates the Illinois Constitution's proportionate penalties clause (Ill. Const. 1970, art. I, § 11), and (3) the restitution order is invalid. For the reasons that follow, we affirm defendant's conviction and remand the matter to the trial court for correction of the restitution order.

¶ 3                                    I. BACKGROUND

¶ 4     In May 2021, the State charged defendant with three counts of first degree murder

(720 ILCS 5/9-1(a)(1), (a)(2) (West 2020)). The information was later supplanted by a superseding indictment for the same offenses. The charges stemmed from the murder of Natwan Nash in the early morning hours of March 7, 2021. His body was found inside his apartment in Bloomington, Illinois, later the same day. He had been shot 10 times and succumbed to his injuries. Defendant was 18 years old at the time of the offense.

¶ 5                                          A. Pretrial

¶ 6        The State sought to admit other-crimes evidence pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). Relevant on appeal, the trial court allowed the presentation of the following evidence: (1) the facts surrounding a 2017 robbery; (2) the facts surrounding a 2018 robbery; and (3) photographs of defendant holding handguns.

¶ 7        During the 2017 robbery, the State alleged defendant wore a hooded sweatshirt and a face mask. Along with an accomplice, defendant pointed a handgun at a gas station clerk and demanded money from the register. The accomplice stated that defendant had initially wanted to "rob a guy for his marijuana" but settled on robbing the gas station. The handguns used in the incident were ultimately determined to be BB guns, though they were replicas of a Walther PPK handgun. Defendant admitted to police that he needed money and wanted to rob someone else, but after discussion with his accomplice settled on the gas station. This incident resulted in a conviction for aggravated robbery.

¶ 8        The 2018 robbery involved defendant shooting the victim seven or eight times with a BB gun. Defendant's girlfriend at the time messaged the victim to arrange a transaction of cannabis for cash. When the victim arrived at the proposed transaction, he observed defendant wearing all black clothing and a mask. Defendant began to rob the victim, but the victim fled. Defendant admitted to shooting the victim seven or eight times with a BB gun while chasing after

him. The victim was shot in the head, back of the neck, arm, and back.

¶ 9        The photographs were taken on November 6, 2020, and showed defendant in possession of firearms. In one photo, defendant is holding a handgun by his side. The State asserted it had consulted a firearms expert, who identified the firearm as a Walther P22. In another photo, defendant was holding two handguns, which were pointed at the camera. The expert determined one of the handguns was the same Walther P22 and the other was a larger caliber handgun, possibly a 9-millimeter handgun.

¶ 10       The trial court found that both prior robberies involved defendant planning to or attempting to rob someone of cannabis. Based on the similar intent and motive of those incidents and the theory of the case for the State, as well as temporal proximity, it held that the evidence's probative value outweighed any undue prejudice. Further, the photographs showed that defendant had opportunity and access to firearms.

¶ 11                            B. Trial

¶ 12       At trial, the evidence established that Nash lived in a townhouse apartment building. It was a 14-building complex with 4 apartments per building. Defendant lived with his grandmother and a cousin in an apartment less than a mile away from Nash. Nash regularly sold cannabis out of his apartment and kept large amounts of it on hand at the apartment. One witness testified that the foot traffic at the apartment was considerable, and there were always people coming and going. Additionally, a person who stayed in the apartment building stated that Nash's apartment smelled like "pot a lot."

¶ 13       Two witnesses testified that they were regular customers of Nash's and had purchased cannabis from him several hours before the shooting. One of those witnesses testified that while purchasing cannabis from Nash in the hours before his death, Nash went into the

basement to retrieve a large black garbage bag. After retrieving the bag, Nash pulled two vacuum-sealed bags of cannabis out of the trash bag. Even after pulling out those two bags, the trash bag looked full. Witnesses also testified that Nash's front apartment door was always unlocked.

¶ 14         In the late night hours of March 6, 2021, surveillance footage from a convenience store showed Nash arriving at the store in a vehicle. He entered the store with a stack of cash bound in a rubber band. He was tossing the bound cash in the air as if he was shooting a basketball. He purchased a bottle of alcohol, cigarettes, and lottery tickets at approximately 11:57 p.m., about 30 minutes before he was murdered. Nash drove away from the store at approximately 11:59 p.m. At approximately 12:07 a.m., defendant arrived at the store on foot and purchased a bottle of Clear Fruit flavored water. Police were able to identify defendant through a search of social media and extraction of cellular phone records. Defendant was dressed in all black clothing (black shoes, a black vest with a second tone bordering on gray, a black hooded sweatshirt, and a black stocking cap). He was also wearing a black face mask. Defendant left the store on foot. Based on his text messages with Nash, defendant then went to Nash's apartment to purchase cannabis. A doorbell camera from a residence approximately half a mile away from Nash's apartment captured defendant passing by at 12:12 a.m. on the way to Nash's apartment. The footage showed defendant apparently wearing the same clothing and carrying the water bottle as seen in the convenience store video.

¶ 15         Video doorbell footage from the apartment neighboring Nash's did not show defendant arriving there. Testimony indicated that this may have been because of the device's settings and the weakness of its wireless connection. The video doorbell did, however, capture defendant leaving Nash's apartment at 12:23 a.m. The bottle of Clear Fruit flavored water was not visible in his hands, but he was still wearing the same clothing. Phone records indicate that at 12:26

a.m., defendant made a video call to Nash that lasted for 17 seconds. This was the last call that Nash answered before his death. Three minutes later, a doorbell camera from another apartment in the complex captured what sounded like 10 to 11 gunshots. At approximately 12:30 a.m., surveillance video from a residence on the other side of the street shows someone walking in the opposite direction of the apartment complex carrying a large garbage bag like item. That person wore black clothing, a two-toned jacket, and black shoes like those of defendant.

¶ 16    When police arrived, they discovered Nash's body face down on the living room floor of his apartment, having been shot 10 times. Officers found shell casings at various spots on the living room floor. Six bullets were recovered from Nash's body. There was evidence that one of the shots was fired at close-range. There was "tattooing" of gunshot powder into Nash's finger, indicating the muzzle of the gun was close when it was fired. The bullets were all .22 long rifle caliber, and forensic testing showed that all were fired from the same gun. The rifling pattern was consistent with a Walther P22 firearm, but the bullets could have been fired from any 1 of 478 different guns. The front door area consisted of a small linoleum patch of flooring before transitioning into carpeting. Blood splatter and pooling were present on the floor near the front door. Police also found a blue Clear Fruit water bottle near the doorway on the linoleum flooring, and subsequent forensic analysis revealed defendant's fingerprint on the bottle. The apartment had a back door, but the deadbolt on that door was locked when police arrived.

¶ 17    While a search of the home revealed drug paraphernalia, no drugs or firearms were found in the apartment. There was, however, a strong aromatic smell of raw cannabis. Police found a large stack of cash sitting in open view on the bed in an upstairs bedroom. Evidence also established that Nash had planned on meeting separately with two different women on March 6.

¶ 18    Approximately 12 hours after Nash was killed, defendant canceled his cellular

phone service for the number he had been using to communicate with Nash. Members of Nash's family attempted to call the last contact in his phone (defendant), but the number was disconnected. Once his prior number was disconnected, defendant immediately began using a different cellular number to communicate with his mother.

¶ 19        Defendant's mother left her home in Rochester, Minnesota, on March 7, and after a drive of several hours, helped defendant move out of his grandmother's home in Bloomington, where he had been living. Defendant went to Rochester with his mother on March 8. According to testimony, the mother's unplanned trip from Rochester to Bloomington was purportedly to allow her to visit defendant's grandmother, although she stayed for only about 30 minutes before leaving again. On March 10, police searched defendant's grandmother's home and found a pair of black shoes that belonged to defendant. Those shoes resembled the pair defendant was seen wearing at the convenience store and when leaving Nash's apartment. Detectives identified a stain on the left shoe that appeared consistent with blood. That stain preliminarily tested positive for blood and had the appearance of blood in photographs. Subsequent DNA analysis revealed a mixture of DNA profiles from the stain on the left shoe. One profile was a major profile sufficient to provide a statistical probability of a match, and the other was a minor profile that could not provide a probability of a match. The major profile from the stain on defendant's left shoe tested positive for a DNA profile consistent with that of Nash, with a statistical probability of 1 in 1.1 nonillion for 23 short tandem repeat loci. Nonillion is "a number followed by 30 zeros."

¶ 20        Defendant's grandmother testified that defendant's mother came and moved defendant to Rochester in the middle of the night despite the fact he was supposed to move into his own apartment in Bloomington two days later.

¶ 21    Extractions from cellular devices collected by police showed that Nash and other persons were engaged in a conversation where threats of violence were exchanged. Nash was texting a woman in whom he had a romantic interest, although she was the paramour of another man. Nash ended up sending several images of firearms to the paramour of that woman. After additional investigation, the woman and her paramour were ruled out as suspects due to a corroborated alibi, along with cellular phone records and location data.

¶ 22    In May 2021, defendant was interviewed by detectives from Bloomington while he was detained in Rochester. Relevant here, he admitted that he was in Bloomington in January 2021, but he claimed he had left the area prior to March. He also denied being employed while he was living in Bloomington, a fact that was rebutted by pay stubs issued in February from a Bloomington fast food restaurant. He also denied knowing Nash. When confronted with still images taken from the recordings inside the convenience store on March 6, 2021, defendant denied that he was depicted in those images. Moreover, he said he did not own a two-toned jacket. He denied ever owning a pair of shoes as depicted in the evidence photos of the pair obtained from his grandmother's home. Defendant had "no idea" how his fingerprint would be on a bottle located at the crime scene. A redacted recording of the interview and a transcript was submitted into evidence.

¶ 23    The State also introduced the other-crimes evidence permitted pursuant to its pretrial motion. Prior to the evidence being received, the trial court admonished the jury that the evidence was only to be considered for the limited purpose of defendant's "intent, knowledge, motive, plan, and access to firearms." The State elicited the other-crimes evidence via testimony from members of the Rochester, Minnesota, police department. The testimony established that in 2017, defendant was investigated for the aggravated robbery of a gas station in Rochester in which

he and another person, while wearing masks, brandished what appeared to be firearms. When interviewed in relation to that robbery, defendant admitted that he and his accomplice planned and committed the robbery with replica BB guns to obtain money. Defendant initially intended to rob a person but ultimately decided to rob the gas station. No testimony was elicited about what defendant was wearing at the time of the robbery or whether he intended to initially rob someone of cannabis.

¶ 24       In 2018, defendant was investigated for another robbery in Rochester in which he had made arrangements to purchase cannabis from someone. When that person arrived at the prearranged meeting place, defendant and his girlfriend attempted to rob him. When the victim fled, defendant shot him multiple times with a BB gun. When interviewed, defendant admitted he had arranged the purchase of cannabis as a setup to rob the victim and then shot him seven or eight times when the victim fled.

¶ 25       The State also offered into evidence the photographs of defendant displaying two handguns. These photographs were discovered on another person's cellular phone by Rochester police. The photographs were received for the limited purpose of "defendant's opportunity and access to firearms." The trial court admonished the jury that the photographs could be considered for only that limited purpose. A gunsmith expert testified that based on his 33 years of experience, one of the firearms defendant was holding in the photographs was a Walther P22 handgun that shot a .22 long rifle caliber bullet. The gunsmith could not positively identify the other gun due to the limited view in the photograph, but it appeared to be a 9-millimeter caliber handgun.

¶ 26       Defendant called Denishia Posey to the stand. She testified that she used to purchase cannabis from Nash, and on March 7, 2021, at approximately 6 p.m., she went to his apartment to do so again. This would have been several hours after Nash had been murdered but

before his body was discovered. She knocked on the apartment door and heard someone say, " 'Who is it?' " She answered that it was " 'Nishia,' " but there was no response, and she eventually left without entering the apartment. She could not tell if it was Nash who asked who was at the door, but the voice came from inside the apartment. This series of events was generally confirmed by the neighbors' video doorbell camera. The State elicited rebuttal testimony from a detective who interviewed Posey on March 9, 2021, when she told him that she heard a male voice ask, " 'Who is it?' " after she knocked on the door. However, at that time, she was unsure of whether the voice came from inside Nash's apartment.

¶ 27                                C. Closing Arguments and Verdict

¶ 28         During closing arguments, the State argued that the prior robberies in 2017 and 2018 were "motivated by marijuana or greed" and that the jury could consider that evidence and the photographs of defendant in possession of handguns for the limited purpose of defendant's intent, plan, motive, opportunity, and access to firearms. The prosecution reiterated that defendant was masked up and used a BB gun that looked like a real gun during the gas station robbery. In the other robbery, defendant wanted to steal cannabis and shot the victim several times with a BB gun. Photographs showed defendant holding a Walther P22 handgun months before Nash's death. The same type of handgun was included in the kind of firearms that could have shot Nash. The person who was recorded walking away from the apartment complex was carrying a large bag, and testimony had established there had been a large bag full of cannabis in Nash's apartment.

¶ 29         Defendant argued that Nash had been involved with multiple women who had paramours or family members who possibly did not care for him, in addition to selling drugs and openly displaying money around the time of his death. There were several people who could have had a motive to murder Nash. Further, it was possible the crime scene was altered based on Posey's

- 9 -

testimony and the related video doorbell footage; defendant argued that this evidence showed someone was possibly in the apartment "cleaning up" after Nash's death. Moreover, defendant cast aspersions on the forensic evidence, arguing that there was no definitive test showing the stain on his shoe was blood.

¶ 30 Following deliberations, the jury returned a guilty verdict and additionally found defendant had discharged a firearm that proximately caused great bodily harm or death to another.

¶ 31                                                                                 D. Posttrial Motion

¶ 32 Defendant filed a motion for a new trial arguing that the admission of the other-crimes evidence denied him a fair trial. Specifically, he argued that the State used the photographs as propensity evidence and that the trial court erred in allowing evidence of the other robberies to reach the jury. The State argued that the photographs were relevant to the case because they showed defendant with firearms months prior to the shooting and one of the handguns used the same caliber ammunition that was used to murder the victim. Moreover, the court had previously weighed the possibility of unfair prejudice against defendant and found that consideration did not prohibit evidence of the prior robberies.

¶ 33 The trial court denied defendant's motion, finding that admission of the complained of evidence was proper.

¶ 34                                                                                     E. Sentencing

¶ 35 The matter proceeded to sentencing, where the presentence investigation report (PSI) was submitted to the trial court. The PSI reflects defendant's statements that he had a violent childhood and was introduced to guns at a young age and began selling drugs around age 11. When he was 12, his sister was killed due to gang violence. He moved to Chicago, Illinois, and later to Minnesota, where he was adjudicated delinquent on charges of theft, riot, assault, possession of

dangerous weapons, disorderly conduct, two aggravated robberies, and assault with a dangerous weapon. He also had adult convictions for aggravated robbery, assault with a dangerous weapon, and domestic assault. Another PSI prepared previously in another matter stated defendant had behavioral and attendance issues in school and had been suspended for fighting. In January 2019, defendant was successfully discharged from a youth treatment program. Defendant expressed a desire to change and apply the coping mechanisms he had learned. Staff found him to have "quality traits" and that he displayed "leadership qualities." Defendant's daughter was born when he was 16 years old, and he lived with the mother for a time. However, allegations of domestic violence within the home followed.

¶ 36   At the time of this case, defendant was on probation and had violated that probation by failing to complete a residential treatment program in 2020. While in custody on the current charges, defendant incurred multiple minor and major violations, including assault and aggravated battery. Both of the latter incidents resulted in additional criminal charges. Also, while in custody, defendant was diagnosed with posttraumatic stress disorder, generalized anxiety disorder, tetrahydrocannabinol abuse, nicotine abuse, and "Cluster B Personality Disorder." Defendant completed several required GED classes, including classes in communication skills, stress management, and mental health first aid. Defendant argued that he "had to grow up faster than any kid should have to."

¶ 37   The State presented testimony of Rochester police that, among other things, established that they seized and searched two vehicles tied to defendant. In one vehicle, they found a loaded 9-millimeter handgun, additional ammunition, and a two-tone jacket like the one defendant was previously seen wearing but denied owning. In the other vehicle, police found additional 9-millimeter ammunition, defendant's identification card, his social security card, and

a flyer and lease for an apartment in Bloomington. The State also submitted receipts for Nash's funeral expenses.

¶ 38 Despite defendant's youth, the State argued an 85-year sentence was justified by his criminal history and the need for deterrence. There were no statutory factors in mitigation, and defendant could not be rehabilitated. Defendant argued for a 45-year sentence based on his youth, potential for rehabilitation, turbulent upbringing, participation in educational programs, and the excessive hardship on his daughter.

¶ 39 The trial court imposed a 55-year sentence, along with a 25-year firearm enhancement, for a total sentence of 80 years' imprisonment. In doing so, the court explicitly stated it was considering defendant's age and the relevant statutory factors and caselaw attendant to it. Specifically, the court mentioned cases like *Miller v. Alabama*, 567 U.S. 460 (2012), *Graham v. Florida*, 560 U.S. 48 (2010), *Roper v. Simmons*, 543 U.S. 551 (2005), and *People v. Buffer*, 2019 IL 122327. The court opined,

> "I am considering your age, how that relates to impetuosity, maturity at the time of the offense, your family and home environment, how that—the information I have at least as to how that impacted you, the home environment, your educational and social background, and whether or not you were or were not subject to outside pressures on this, and I'm considering those in light of your age, but being 18 doesn't mean that you can't have empathy or compassion for another person. And it's not just this case, but all the other information I have in front of me in terms of just the life you were living, the decisions you were making where it doesn't look like in other circumstances—I mentioned how maybe at age 11 you were under the influence of somebody else guiding you into some bad decisions. It looks like

you've had a lot of opportunities more recently where you have been the one making those decisions. I do see a level of violence and depravity that shows a very low chance of significant rehabilitation."

The court also entered a restitution order to reimburse Nash's mother and former paramour for funeral expenses. The court did not indicate whether the amount had to be paid in a lump sum or in installments.

¶ 40                              F. Motion to Reconsider Sentence

¶ 41        Defendant filed a motion to reconsider his sentence where he claimed that the sentence violated the Illinois Constitution's proportionate penalties clause. At the hearing, defendant argued that he was only 18 at the time of the offense and that based on the PSI and his actions while incarcerated, the sentence ignored his immaturity at the time of the offense and his potential for rehabilitation. In denying the motion, the trial court reaffirmed that it had considered *Miller* during sentencing and reasoned,

> "I don't think there's anything magical—something legal about turning 18, but it's not something where all of a sudden someone turns 18 and now all of a sudden they are more mature and their brain works differently. I do recognize that there is an impact there, and that even amongst individuals you could have a 16 year old who is far more mature and mentally developed than a 22 year old. And I did factor that in. In *** [defendant's] case the basis for the sentence was also one of the factors was what the Court considered an immense amount of aggravation that outweighed a great deal of that. I did consider those factors in mitigation when I sentenced the defendant."

¶ 42        This appeal followed.

¶ 43                                    II. ANALYSIS

¶ 44        Defendant argues that (1) he was denied a fair trial where the State introduced improper other-crimes evidence of the 2017 and 2018 robberies, as well as the photographs of him in possession of handguns, (2) his sentence violates the proportionate penalties clause as applied, and (3) the restitution order is invalid. We address each contention in turn.

¶ 45                              A. Other-Crimes Evidence

¶ 46        "The term 'other-crimes evidence' encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial." *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005). "The trial court may admit evidence of other crimes, wrongs, or acts of misconduct to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident [citation], but the evidence must be relevant without relying on a propensity inference." (Internal quotation marks omitted.) *People v. Smart*, 2025 IL 130127, ¶ 72; see Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) (same). The showing of propensity via other-crimes evidence "is objectionable because such evidence has 'too much' probative value," not because it lacks relevance. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (quoting *People v. Manning*, 182 Ill. 2d 193, 213 (1998)).

¶ 47        The essential characteristic of proper other-crimes evidence is that it allows the finder of fact to reach some factual conclusion through a "propensity-free chain of reasoning." *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (*en banc*) (applying Fed. R. Evid. 404(b) (eff. Dec. 1, 2011)); see *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 108 ("The Illinois Rules of Evidence largely track the Federal Rules of Evidence. [Citation.] Thus, it is appropriate to look to federal cases for guidance."). While defendant disputes the proper mode of review, we conclude that a trial court's admission of other-crimes evidence is reviewed for an abuse of

discretion. *Donoho*, 204 Ill. 2d at 182. Consequently, we will find error only if the court's ruling was "arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *Id.*

¶ 48                                    1. *Photographs*

¶ 49        Initially, we disagree with defendant that the photographs of him in possession of handguns constituted other-crimes evidence. "Evidence concerning the facts and circumstances of the crime the defendant is accused of committing is not other-crimes evidence." *People v. Stevenson*, 2014 IL App (4th) 130313, ¶ 44.

¶ 50        As defendant notes, we have rejected similar arguments that attempted to characterize a defendant being photographed with firearms as other-crimes evidence. See *People v. Brown*, 2024 IL App (4th) 220959-U, ¶ 56. Under the circumstances of this case, this evidence was not other-crimes evidence and was relevant because it depicted defendant's possession of a firearm which was capable of discharging the same caliber bullet with which the victim was shot 10 times. Furthermore, even if the photographs do constitute other-crimes evidence, there was nothing improper about their admission. See *People v. Pursley*, 284 Ill. App. 3d 597, 604 (1996) (finding evidence admissible to show that the defendant had access to the alleged murder weapon).

¶ 51        Defendant questions whether the Walther P22 depicted in the photograph was real, whether he still possessed it at the time of the offense, or whether the guns were his at all, given that the images were found in someone else's possession. These are arguments to be made to the trier of fact and go to the weight of the evidence, not its admissibility. Therefore, there was no error in admitting the photographs.

¶ 52                                    2. *Prior Robberies*

¶ 53        Next we review defendant's argument that evidence of the prior robberies should

not have been admitted. We begin with the observation we recently made in *People v. Smith*, 2025 IL App (4th) 230866-U, ¶ 58:

> "When addressing the nearly identical federal rule (Fed. R. Evid. 404(b) (eff. Dec. 1, 2011)), the Seventh Circuit 'cautioned that it's not enough for the proponent of the other-act evidence simply to point to a purpose in the "permitted" list and assert that the other-act evidence is relevant to it.' *Gomez*, 763 F.3d at 856. Instead, trial courts 'should not just ask *whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference.' (Emphases in original.) *Id.* We believe this same degree of caution is advisable when trial courts apply Illinois Rule of Evidence 404(b)."

Note that *Gomez* was commented upon favorably by the Illinois Supreme Court in *Smart*, 2025 IL 130127, ¶ 72.

¶ 54    Unfortunately, the State below followed the exact " 'permitted' list" approach we cautioned against in *Smith*. In its motion seeking admission of the other-crimes evidence, the State said that the evidence was relevant to "established common law purposes including motive, opportunity, intent, preparation, plan, knowledge, identity, [and] absence of mistake or accident." It would be a most exceptional piece of evidence that would help prove *all* of these things, at least if something more than propensity is being relied upon.

¶ 55    For its part, the trial court scrutinized the issue more closely. It found more narrowly that evidence of the 2017 and 2018 incidents was relevant to show defendant's motive or intent. However, courts must guard against lumping together these distinctly different concepts. "Although motive and intent both involve the defendant's mental state, they are analytically

distinct; intent addresses *what* the defendant wanted to do, while motive addresses *why* he wanted to do it." (Emphases in original.) *Smith*, 2025 IL App (4th) 230866-U, ¶ 62. It is difficult not to see these words from *Smith* as being equally applicable here:

> "Evidence of the 1994 robbery is simply not justified on the basis of showing defendant's intention or motive. If defendant admitted committing the act giving rise to the crime but denied the requisite intent, the fact that he previously committed an earlier, similar crime might help show his true intent. Here, however, the dispute is not what defendant intended when he stabbed Bricker, but whether he did so at all. The earlier robbery offers no assistance in answering that question. Similarly, if defendant admitted entering Bricker's residence but denied the intention to rob her or do her harm, the prior incident of entering an elderly woman's home to beat and rob her might be highly relevant evidence of motive. Here again, however, the issue is not what motivated defendant to do what he did; it is whether he did it at all." (Emphasis omitted.) *Id.* ¶ 63.

¶ 56 The general rule against the admission of other-crimes evidence is not difficult to understand: "[t]he law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime." *People v. Lehman*, 5 Ill. 2d 337, 342 (1955). The concern with such propensity evidence is not diminished simply because the same proposition is reframed as relating to intent or motive, *i.e.*, because the defendant did it before, he *intended* to do it again or was *motivated* to do it again. In other words, even if "the State's supposed objective in offering the other-crimes evidence is to show motive or intent, the evidence was relevant to this purpose only to the extent it showed defendant's *propensity* to commit the offense at issue." (Emphasis in original.) *Smith*, 2025 IL App (4th) 230866-U, ¶ 64.

- 17 -

¶ 57　　　　With specific regard to evidence of intent, "other-crime evidence may not be admitted to prove intent where the defendant's intent is not contested at trial." *People v. Clark*, 2015 IL App (1st) 131678, ¶¶ 32, 41 (finding error in the admission of other-crimes evidence where the defendant was charged with stealing a bicycle and the defense was not "that his theft was merely negligent or reckless, or that he intended to return it—he said he was not the thief at all"). Here, defendant's version of events was that he was not the person who killed Nash. There is no suggestion that defendant, or anyone else, entered Nash's apartment and accidentally shot him 10 times. This case turns on identity, and the trial court here correctly found that the degree of similarity between the former offenses and the current one did not reach the level necessary to prove identity via *modus operandi*. See *Smith*, 2025 IL App (4th) 230866-U, ¶ 71 (noting the high degree of similarity required to prove identity when there is not a specific evidentiary link between the crimes). Here, characterizing the evidence of the earlier robberies as being relevant to "intent" is a transparent attempt to rely on defendant's *propensity* to commit such offenses, not his mental state when committing the crime at issue.

¶ 58　　　　Similarly, as to motive, the State never articulated why defendant's commission of a robbery in 2017 or 2018 would have *motivated* him to commit the offense at issue here. While it is plausible that the intent to rob a drug dealer of cannabis was the motive behind all three offenses, this would be independently true of the offense here without reference to the earlier offenses, *i.e.*, the State argues that defendant's motive was to rob Nash and that he shot him in the process. The earlier offenses add nothing on this point beyond suggesting defendant's *propensity* to commit such offenses. The supreme court has recently reaffirmed that other-crimes evidence " 'must be relevant without relying on a propensity inference.' " *Smart*, 2025 IL 130127, ¶ 72 (quoting *Gomez*, 763 F.3d 859).

¶ 59    The trial court also suggested other possible reasons for admission of evidence of the earlier offenses: "plan" (though it is unclear how defendant's actions in Minnesota were part of a plan to commit a robbery or murder in Illinois years later) and "knowledge" (though knowledge of what, precisely, is unclear). Regardless, we do not feel the need to specifically address the propriety of the evidence in question in this case because it is clear that any error in its admission was overwhelmingly harmless.

¶ 60                            3. *Harmless Error*

¶ 61    Even when a reviewing court finds that the admission of other-crimes evidence was erroneous, reversal is not automatic, as the error is subject to a harmless error analysis. *People v. Nieves*, 193 Ill. 2d 513, 530 (2000). Here, the State argues that any error resulting from the improper admission of evidence was harmless because the evidence "was so overwhelming that no fair-minded jury could have voted for acquittal."

¶ 62    "The erroneous admission of other-crimes evidence requires reversal 'only if the evidence was "a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different." ' " *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 24 (quoting *People v. Adkins*, 239 Ill. 2d 1, 23 (2010), quoting *People v. Hall*, 194 Ill. 2d 305, 339 (2000)). In determining the nature of an error, the court may "(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008). Where the improper evidence was not a material factor in the defendant's conviction or the properly admitted evidence is overwhelming, the error is harmless. *Kendrick*, 2023 IL App (3d) 200127, ¶ 24.

¶ 63        Here, evidence placed defendant near the scene of the crime just before Nash was murdered. Footage from the convenience store depicted defendant in an all-black outfit with black shoes and a two-toned black coat purchasing a bottle of Clear Fruit water. Through text messages and footage from cameras along the route, it was established defendant made his way to Nash's home to purchase cannabis. Footage from the neighboring apartment's doorbell camera showed defendant leaving prior to Nash's murder. There was no video evidence showing defendant leaving the area of Nash's apartment building despite cameras along the route he traveled to get there. However, other evidence showed that defendant made a video call to Nash shortly after leaving, and the call lasted for 17 seconds. Three minutes after that call, another camera in the complex recorded the sound of 11 gunshots. A person wearing similar all-black pants and shoes and a two-toned jacket is then recorded walking away from the apartment complex with a large bag. Evidence showed that Nash kept a large amount of cannabis on hand in a garbage bag, but police did not find the bag in the apartment.

¶ 64        Nash was shot 10 times with a gun capable of firing .22 long rifle caliber ammunition, and defendant was photographed with a Walther P22 capable of firing the same caliber of ammunition months earlier. Police found the Clear Fruit water bottle in Nash's apartment with defendant's fingerprint on it. Police also found black shoes in defendant's grandmother's residence resembling those defendant was wearing that evening and bearing a stain that appeared to be blood. In addition to looking like blood, that stain presumptively tested positive for it. More importantly, whatever the stain consisted of, it contained DNA matching Nash's by an exorbitant probability. As shoes resembling those worn by defendant on the night in question were found in his grandmother's house and bore the victim's DNA, such facts are largely incompatible with defendant's innocence unless his grandmother had some other connection to Nash's murder.

¶ 65        Other evidence established defendant's consciousness of guilt. The jury saw his interrogation video, where he denied (1) being in Bloomington around the time of the murder, (2) that it was him depicted in still photographs taken from the convenience store surveillance footage, (3) that he ever owned the pair of black sneakers that were seized from his grandmother's house, (4) that he owned a two-toned jacket like the one he was depicted wearing in the convenience store, (5) that he knew Nash, and (6) knowing how he moved back and forth between Rochester and Bloomington.

¶ 66        Further, the jury heard how immediately following Nash's murder that defendant fled Bloomington and canceled his phone service for the number he used to communicate with Nash. His departure was unplanned, as his grandmother testified that defendant was supposed to move into his own apartment in Bloomington only days later, and the paramour of defendant's mother's testified that the trip to pick him up was not planned.

¶ 67        We also must note that there were numerous admonishments and a jury instruction given to the jury about the nonpropensity use of the other-crimes evidence, even if the evidence itself was improperly admitted. The trial court noted several times that the jury was only to consider the complained of evidence for a limited nonpropensity purpose. While this guidance from the court to the jury does not automatically cure any error, it did serve to lessen the potential prejudicial effect of the admitted evidence. See *People v. Illgen*, 145 Ill. 2d 353, 376 (1991) ("Such an instruction limited and substantially reduced any prejudicial effect created by the admission of the prior-offense evidence.").

¶ 68        Based on the foregoing, the evidence of the prior robberies was not a material factor in defendant's conviction such that there is a probability the verdict would have been different absent that evidence. *Adkins*, 239 Ill. 2d at 23. The properly admitted evidence in this case was

overwhelming, so admission of the improperly admitted evidence was harmless.

¶ 69                                      B. Proportionate Penalties Clause

¶ 70        Defendant notes that he was 18 years old at the time of the offense and asserts his 80-year sentence constitutes a *de facto* life sentence that deprives him of a chance at rehabilitation. Consequently, he argues that as applied to him, the 80-year sentence violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11).

¶ 71        Defendant relies on *Miller* and its progeny and acknowledges the statutory scheme that provides defendant will be eligible for parole after serving 20 years of his sentence. See 730 ILCS 5/5-4.5-115(b) (West 2024) (noting that with certain exceptions, a defendant under 21 "at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 *** shall be eligible for parole review *** after serving 20 years or more" of a sentence). He argues that the protections articulated in *Miller* apply to him as a young adult and that section 5-4.5-115(b) does not provide the meaningful opportunity for release that might diminish his *de facto* natural life sentence. Of course, these specifics points of his argument are now moot following the Illinois Supreme Court's decision in *People v. Spencer*, 2025 IL 130015.

¶ 72        The defendant in *Spencer* was 20 years old when he committed first degree murder, attempted murder, and home invasion and was sentenced to 100 years' imprisonment. *Id.* ¶ 1. The defendant argued to the Illinois Supreme Court that his *de facto* life sentence, as applied, violated the proportionate penalties clause and that he was entitled to protections enumerated under *Miller* because the statutory parole scheme failed to provide a meaningful opportunity for his release. *Id.* ¶ 23. The *Spencer* court rejected the defendant's argument, finding that *Miller* did not apply to the defendant because he was an emerging adult, not a juvenile. *Id.* ¶ 32. Further, because the statutory parole scheme allowed for an opportunity for parole after the defendant served 20 years, his

sentence could not be characterized as a *de facto* life sentence. *Id.* ¶ 40. Nonetheless, the defendant was not precluded from asserting an as-applied challenge under the proportionate penalties clause because the essence of such an argument is that the sentencing judge "failed to set the sentence 'according to the seriousness of the offense and with the objective of restoring the [defendant] to useful citizenship.' " *Id.* ¶ 42 (quoting Ill. Const. 1970, art. I, § 11).

¶ 73        The foregoing leaves only defendant's as-applied proportionate penalties clause argument to be addressed. As mentioned, the proportionate penalties clause requires "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In order to mount an as-applied challenge, the defendant must sufficiently develop the record relating to the specific facts and circumstances that would result in an unconstitutional application. *People v. Harris*, 2018 IL 121932, ¶ 39. Absent a well-developed record following an evidentiary hearing, appellate review on the question of whether a certain application is unconstitutional as applied is untimely. *Id.* Defendant also argues, in the alternative, that if the record is insufficient to evaluate the as-applied challenge on appeal, trial counsel was ineffective for failing to provide a sufficient record.

¶ 74        Almost this exact factual circumstance was presented to us in *People v. Moore*, 2025 IL App (4th) 240592-U. At sentencing, "the trial court specifically discussed factors related to youth in explaining its sentence" and "school and medical records attached to the PSI documented defendant's lead poisoning diagnosis, as well as diagnoses of ADHD, bipolar disorder, and a mood disorder." *Id.* ¶ 35. Those records also "indicated that defendant qualified for special education programs because of his high lead levels" and that the defendant's "listening and comprehension skills were at only a third-grade level." *Id.* On appeal, defendant argued that based

on his PSI, the record was sufficient to evaluate his proportionate penalties clause challenge and that, in the alternative, any insufficiency in the record was due to his attorney's ineffectiveness. *Id.* ¶¶ 35, 41. We held that despite the PSI and additional records attached thereto, the record was insufficient, as "written documentation in a PSI showing defendant's mental impairments does not eliminate the need for sworn testimony and factual findings specifically addressing the basis of the as-applied challenge." *Id.* ¶ 40 (citing *People v. Landerman*, 2018 IL App (3d) 150684, ¶ 56.).

¶ 75    In addressing the ineffective assistance claim, we reiterated the familiar test under *Strickland v. Washington*, 466 U.S. 668 (1984), and found that the defendant's argument was premature because the court could not evaluate the prejudice prong "without knowing what testimony or other evidence counsel could have provided." *Moore*, 2025 IL App (4th) 240592-U, ¶ 44. Further, "whatever witnesses defense counsel could have called would be subject to cross-examination from the State, and the State would have the opportunity to challenge or refute any evidence defense counsel might introduce." *Id.* The court went on to quote the partial dissent in *People v. Gates*, 2023 IL App (1st) 211422, asserting that " ' "under no circumstances can conjecture constitute the sole basis for a claim of prejudice." ' " *Moore*, 2025 IL App (4th) 240592-U, ¶ 45 (quoting *Gates*, 2023 IL App (1st) 211422, ¶ 91 (Coghlan, J., partially dissenting), quoting *People v. Hannon*, 48 Ill. 2d 462, 466 (1971)); see also *People v. Estrada*, 2024 IL App (1st) 230029-U, ¶¶ 67-74 (Coghlan, J., dissenting). Accordingly, the as-applied challenge was one best addressed in collateral proceedings where the defendant could develop a sufficient record. *Moore*, 2025 IL App (4th) 240592-U, ¶¶ 44, 46.

¶ 76    Here, we find the reasoning of *Moore* applicable. Although this case is different from *Moore* because trial counsel here raised a proportionate penalties clause challenge in the motion to reconsider defendant's sentence, we find that distinction immaterial. The information

included in the PSI on its own is not sufficient to evaluate defendant's as-applied challenge. Moreover, we will not *assume* that there was sufficient evidence that could have been introduced by counsel to establish a probability that the outcome would have been different. This is especially true where the trial court made clear that it was sensitive to the fact that emerging adults were not necessarily as mature or mentally developed as older adults and considered *Miller* and its progeny but nonetheless found that defendant exhibited "a level of violence and depravity" and "a very low chance of significant rehabilitation." This distinction also undercuts defendant's reliance on *Estrada* because, unlike that case, the trial court here did not convey regret that it could not impose a sentence less than the statutory minimum and in fact imposed a sentence beyond it. See *Estrada*, 2024 IL App (1st) 230029-U, ¶ 37.

¶ 77     Although appellate counsel has attempted to supplement the record with research concerning brain development in emerging adults, we are a court of review; it would be improper for us to consider materials that were not submitted for consideration below. See *Kennedy v. Edgar*, 199 Ill. App. 3d 138, 143 (1990) ("[A] reviewing court will not take judicial notice of critical evidentiary material not presented in the court below, especially where the evidence may be significant in the proper determination of issues between the parties.").

¶ 78     Accordingly, we agree with the reasoning in *Moore* and the dissent in *Gates* and find that defendant's claim is better suited for postconviction proceedings, where he can provide the testimony and other evidence that he claims his attorney should have provided below.

¶ 79                              C. Restitution Order

¶ 80     Finally, defendant argues that the trial court failed to comply with the statute governing the imposition of restitution in that neither the written nor oral ruling of the court included the manner in which the amount of restitution was to be made (lump sum or installments).

See *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 82 (" 'If the court does not specify a particular time [for the payment of restitution], the restitution order is fatally incomplete.' ") (quoting *In re Estate of Yucis*, 382 Ill. App. 3d 1062, 1027 (2008)). The State in its brief concedes the issue, noting that the court in fact failed to comply with the statute in this respect. After reviewing the matter, we accept the State's concession. Therefore, we remand the matter for the limited purpose of allowing the court to set the manner and method of paying restitution in accordance with section 5-5-6(f) of the Unified Code of Corrections (730 ILCS 5/5-5-6(f) (West 2024)).

¶ 81                                    III. CONCLUSION

¶ 82           For the reasons stated, we affirm defendant's conviction and remand the matter to the trial court for modification of the restitution order.

¶ 83           Affirmed and remanded.